## 11348

### DILL *ET AL.* v. SOVEREIGN CAMP, W. O. W.
#### (120 S. E., 61)

1. INSURANCE—EVIDENCE HELD NOT TO AUTHORIZE DIRECTED VERDICT ON THEORY OF SUICIDE.—Evidence that insured's dead body was found hanging by a rope from a tree limb, and conflicting evidence as to his financial trouble and mental status, *held* not to authorize a directed verdict on the theory that insured committed suicide.

2. INSURANCE—INSURER HAS BURDEN OF PROVING SUICIDE.—In an action on a life policy, the burden of proving that insured committed suicide is on insurer.

3. INSURANCE—THAT INSURED DID NOT COMMIT SUICIDE PRESUMED.—There is a presumption of fact that insured did not take his own life.

Before SEASE, J., Greenville, December, 1922.   Affirmed.

Action by Flora Dill et al. against Sovereign Camp Woodmen of the World.   Judgment for plaintiff and defendant appeals.

*Messrs. Hodges & Leatherwood and Martin & Blythe,* for appellant, cite: *Suicide only conclusion from evidence:* 116 S. E., 427; 105 Wis., 217; 29 So., 523; 224 S. W., 733. *Jury not sole judges of effect of testimony as rebutting presumption against suicide:* 87 S. C., 174; 91 S. C., 270; 93 S. C., 71.

*Messrs. Dean, Cothran & Wyche,* for respondent, cite: *Presumption on appeal in favor of respondent:* 112 S. E., 439. *Presumption against suicide:* 112 S. C., 335; 10 R. C. L., 868; 8 L. R. A. (N. S.), 974.

November 16, 1923.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

This is an action on a policy of insurance in the sum of $1,000, issued by the defendant on the life of J. L. Dill (who died on the 5th of December, 1921), in favor of

Flora Dill, his wife, and his surviving children, the plaintiffs herein.

The defendant denied liability, and set up as a defense the provision contained in the policy, that, "if a member dies by his own hand or act, whether sane or insane," it should thereby become null and void.

The case was tried before his Honor, Judge Sease, and a jury, and resulted in a verdict in favor of the plaintiffs for $1,000, and the defendant appealed upon the following exceptions:

(1) "That his Honor, the presiding Judge, erred in overruling the defendant's motion for a directed verdict, made on the ground that the application for a policy, the policy itself, and the constitution and by-laws of the Woodmen of the World provided that the policy is not payable if the deceased came to his death by his own hand or act, and that the testimony is susceptible of no other inference than that the deceased came to his death by his own hand and act."

(2) "That his Honor, the presiding Judge, erred in refusing to direct a verdict in favor of the defendant upon the ground that the testimony was susceptible of no other inference than that the deceased came to his death by his own hand and act."

The record contains this statement:

"At the conclusion of the testimony a motion for a directed verdict in favor of the defendant was made on the ground that the application for a policy, the policy itself, and the constitution and by-laws of the Woodmen of the World provided that the policy is not payable if the deceased came to his death by his own hand or act, and that the testimony is susceptible of no other inference than that the deceased did come to his death by his own hand and act, upon which motion the Court made the following ruling:

" 'In the McKendree Case I felt certain there was no other reasonable inference to be drawn other than that he had committed suicide, and I directed a verdict. After seeing the lawyers they told me frankly I had put it on the wrong ground, and they thought the Supreme Court would reverse me on the ground of suicide. The Supreme Court did reverse me, saying I was in error in directing a verdict, as it was for the jury to say whether there was any other inference to be drawn. So the question must be submitted to the jury. That is the law, and the motion is refused.' "

The following witnesses testified in behalf of the respective parties, as follows:

Mrs. Furman Sloan, for defendant:

"I live in sight of the Dills. She stayed at my house about two weeks after he died. She told me she kept the oldest son out of school as Mr. Dill seemed to be off a little bit. At that time she was talking about his death, but did not say anything else about his mental condition. We just talked about him being off a little, and she kept her son out of school to help gather the corn."

Furman Sloan, for defendant:

"I live 6 miles north of Greer, and about one-fourth mile from Mr. Dill's house. I had not gotten up when I heard the screaming of the Dill family. I dressed as fast as I could and ran over there. I saw Mr. Dill hanging there by a plow line and he appeared to be recently dead He was hanging from the limb by a plow line on the side of the gate next to the house. The rope was doubled and was looped around the neck. When I got there Campbell and Fitts were there. I did not make an investigation and stayed only a few minutes. I didn't particularly notice any tracks, and saw nothing around the place or on the body to indicate a struggle. I saw the doctor examine the body and saw no marks of violence. Mr. Dill's feet were 4 or 6 feet above the ground, and the limb was 3 or 4

feet above the gate. I saw some dirt on the gate some time through the day, but don't know that I noticed it that morning. From the top of the gate a man could reach up and tie a rope around the limb. The rope was 14 or 15 feet long and was doubled. I have known Mr. Dill 14 or 15 years, and did not know that he had any enemies in the community. I don't know much about Mr. Dill's mental condition, but it appeared to me as if his mind were off some. I don't know of any cause for mental trouble recently before his death."

F. B. Fitts, for defendant:

"I examined around the place for other tracks to see if I could discover where anybody else had a hand in the hanging, and saw no others except about 10 steps I saw what looked like children's tracks. I was the first one to get to the place, and Campbell was right behind me. I looked for evidence of foul play and found none. Mr. Dill's clothes were not disturbed, and there were no signs of a man struggling or being carried by other persons. I have known Mr. Dill about 9 years. Three to five days before he died he seemed restless and talked a little to me, and said that he hated to move from where he had lived. He said he had made 7 crops there and was bothered about moving. He was a strong hard working kind of man. When I talked to him he was on foot. He asked me how I was getting along and said he wished John Henson had not died and he would not have had to move. He didn't tell me where he was going nor that he was nervous. He turned and looked off when I was talking, which wasn't an unusual matter for him. I studied about the conversation afterwards, but didn't think anything serious was going to happen. The tracks seemed to come down the path to the house and went up to the end of the gate. Inside the pasture there was a hog lot. I did not see a hog that day and was not looking for hogs. I cannot say whether the shoe that made the track was a 7, 8, or 9.

Where I saw the track was in sand and pine needles. To the best of my knowledge the tracks were Dill's tracks. The shoe has a tolerable low heel of leather."

J. M. Duncan, for defendant:

"I live 6 miles from Greer, about one-fourth mile from where Mr. Dill lives. I went to the place where Mr. Dill was hanging between 7 and 8 o'clock in the morning. I did not make a particular examination of the ground, as there had been several there. I saw sand on the planks of the gate. I believe from the marks I saw on the gate that a man standing there could have tied the rope, looped it around his neck, jumped off and hung himself. I heard Mr. Dill's little boy say that morning that his father said before he died that he would rather die than move where he was going. I could not say exactly where I was when he told me that, but I was not far from where Mr. Dill was hanging. I don't think any one was present when the boy told me that. It was the oldest boy, whose name is Alvin. I don't remember that I ever told any one about what the little boy said."

S. D. Henson, for defendant:

"I went to the place where Mr. Dill was found about 7 or 8 o'clock in the morning. There were several persons there, and I saw Mr. Dill hanging to the limb of the tree. There was a draw knot at the limb, and the loop was around his neck. He was dead. I saw some tracks leading from the house, but several people were there when I got there. I saw marks of sand on the gate on one crosspiece. It seemed to me that Dill's mind was off some. I saw him the week before, but didn't know whether he was off or just seemed like he was not always like he had appeared. I had no talk with him, and didn't see him until the morning when I found him hanging to the tree. I noticed there was something wrong with him mentally. I never saw him do or say anything to indicate that he would do anything serious. He might have been just a

little troubled or in a hurry. I saw a little dirt or sand on the middle panel of the gate. It was a foot or two from the ground, not high enough to stand on that piece and tie a rope around the tree. I did not examine the tracks in the sand."

W. E. Henson, for defendant:

"I lived near Greer and owned the place where Mr. Dill was living. I had a conversation with him about renting the place next year. He first told me there was not enough land, and after that he wanted to stay on it. I did not rent it to him. He didn't get mad about it. I never knew anything about his mental condition, but he seemed like he was a little off during the summer before he died. He showed it about the line between me and him. Kept arguing about the fertilizer. I went up to where he was hanging after dinner time and saw no marks except sand on the gate. I don't remember seeing sand on but one panel. The only reason I think he was off mentally was that he wanted to keep the line between us separate on account of the fertilizer. Didn't think he would do harm to himself."

M. M. Duncan, for defendant:

"I live one-half mile from Dill. I never noticed anything wrong with Mr. Dill's mind."

Defense rests.

A. J. Farnham, recalled for plaintiffs, in reply:

"I belonged to the same church and lodge with Mr. Dill. I saw him at church and knew him pretty well. I saw nothing to indicate that he was mentally unbalanced, and appeared as far as I know to be a normal man. I saw him a while before this happened. I never took any notice of his mental condition."

Alvin Dean Dill, for plaintiffs:

"I am the son of Mrs. Dill, and was 15 on October 22, 1922. I never made a statement that my father said he had rather die than move. The children played on the gate and rode back and forth on it the day before."

Cross-examination by Mr. Blythe:

"I was at the gate where my father was hanging but didn't talk to any one gathered around there."

The foregoing is substantially the testimony that was introduced upon the trial of the case. The burden of proof rests upon the defendant to show, by the preponderance of the evidence, that the insured took his life by his own hand or act.

Not only was the testimony upon which the appellant relied to establish such fact entirely circumstantial, but there was a presumption of fact that the insured did not take his own life. The rule is thus stated in the case of *McKendree v. Ins. Co.,* 112 S. C., 335; 99 S. E., 806:

"The presumption of fact is that a man will not take his own life. Every action of a man, voluntary and involuntary, tends to preserve his life."

The reason for such a presumption is thus stated in 10 R. C. L., 868:

"Legal presumptions are rules established by the common law, and are founded upon the first principles of justice, or the laws of nature, or the experienced courses of human conduct and affairs, and the connection usually found to exist between certain facts. Whence, one fact is proved or ascertained, another, its uniform concomitant, is universally and safely presumed. And it is this uniformly experienced connection which holds to its recognition by the law without other proof."

The appellant's attorneys thus state their views of the testimony which we have heretofore substantially reproduced.

"Could any fact or circumstance be wanting to firmly convince one that Dill committed suicide? There is no essential fact or circumstance wanting here to establish a clear and perfect case of suicide. The customary mental condition that precedes suicide, a very common method of

committing suicide, and a web of circumstantial evidence, complete in every detail and circumstance. No single circumstance or bit of evidence disputed—a man worried, his mental stability affected, noticeable not only by members of his own family but by neighbors and those who had occasion to come in contact with him; a man who had expressed himself as preferring to end his life than to do the thing required of him, move from the place where he had resided for 7 years. This condition followed by the natural and common thing, suicide, the circumstances and conditions of which link arm in arm with the conditions that preceded his death. No opportunity for accident, no motive or the slightest evidence of foul play, but a sound, clear picture, presented and shown by circumstantial evidence so fully and so completely as to prevent and preclude any doubt in the minds of any reasonable men that Dill met his death by his own hand and act."

It will be observed that the testimony of the witnesses upon some of the most material circumstances was in direct conflict, and upon others that it was very meager.

The two circumstances upon which the appellant's attorneys mainly rely are, first, that the insured was in great financial trouble, and, second, that he had lost his mind. The testimony upon these two circumstances was conflicting and susceptible of more than one inference; and, if his Honor, the presiding Judge, had directed a verdict for the defendant, he would have invaded the province of the jury.

In the case of *Renno v. Ry.,* 120 S. C., 7; 112 S. E., 439, this Court used the following language:

"We deem this an opportune time to call attention to the fact that the jury of twelve men, in a common-law case, for which the Constitution provides, has been regarded from time immemorial as better qualified to pass upon the facts of the case than even the judge. And the presiding Judge, by reason of the fact that he heard the witnesses

testify, and could judge of their credibility, had a better opportunity than the members of this Court to determine the proper inferences to be drawn from the testimony. Furthermore, as the jury and the Circuit Judge have found that there was such testimony, there is a presumption in this Court that the trial in the Circuit Court was free from error. Therefore the plaintiff occupies a more favorable position than he did in the Circuit Court, when the burden of proof rested upon him."

Although the burden of proof as to the cause of the death of the insured herein was upon the appellant, nevertheless the respondents occupy a more favorable position than they did in the Circuit Court.

Affirmed.

MESSRS. JUSTICES WATTS and FRASER concur.

MR. JUSTICE COTHRAN: I do not agree to the proposition contended for by the respondents, which I do not mean to say is approved by the Chief Justice, that "in all cases based upon a presumption of fact the jury shall be the sole judges of the effect of the testimony as rebutting the presumption." I think that the contrary is held in the cases of *Baker v. Tel. Co.,* 87 S. C., 174; 69 S. E., 151; *Parnell v. R. Co.,* 91 S. C., 270; 74 S. E., 491; *McLeod v. R. Co.,* 93 S. C., 71; 76 S. E., 19, 705.

I am convinced, under the rule declared in these cases, that no other reasonable inferences can be drawn from the evidence than that the insured committed suicide, and that the defendant was entitled to a directed verdict. *Horton v. W. O. W.,* 117 S. C., 409; 109 S. E., 649.

MR. JUSTICE MARION concurs in this dissent.