13069

SWOFFORD *ET AL.* v. LIFE INSURANCE CO. OF VA.

(157 S. E., 7)

*Messrs. Thomas & Lumpkin,* for appellant, 

*Messrs. T. K. Vassy, Barron & Barron* and *C. N. Sapp,* for respondent,

February 17, 1931.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

Briefly stated, the facts out of which this action arose are as follows: On July 18, 1927, the defendant insured the life of one John L. Swofford in the sum of $1,000. The policy provided that the insurance, at the death of the insured, be paid to his wife, Mrs. Bertie Swofford, but should she predecease him, then to his executors, administrators, or assigns, and contained the following clause:

"If within one year from the date of this policy the insured shall die by his or her own hand or act, whether sane

or insane, the liability hereunder shall be limited to the amount of the premiums paid under this policy."

The insured died on or about July 4, 1928, having been predeceased by his wife. Thereafter, in compliance with the terms of the policy, proofs of the death of the insured were furnished the defendant, which refused to pay the insurance but offered to return the premiums with interest. This action was then brought by the administrators of the insured's estate.

The answer admitted the issuance of the policy and the payment of the premium, but alleged that the proofs of death conclusively showed that the insured died by his own act less than one year after the delivery of the policy, and that therefore the company's liability was limited to the amount of the premiums paid.

Defendant's motion for a directed verdict was overruled, and the case submitted to the jury, who found for the plaintiffs. A motion for a new trial was also denied, and from judgment entered on the verdict this appeal is taken.

Counsel for appellant argue with great earnestness that the trial Court erred in refusing the motion for a directed verdict, made upon the ground that the evidence was susceptible of only one reasonable inference, namely, that the insured came to his death by his own hand within the first insurance year.

The respondents contend that, the defendant having pleaded the defense of suicide by the insured, the burden was upon it to establish that defense by clear and satisfactory proof, that the presumption against suicide was not overcome by the evidence, and that therefore the Court would have erred in directing a verdict for the company.

In 10 R. C. L., at page 868, we find the following:

"Legal presumptions are rules established by the common law or statute, and are founded upon the first principles of justice, or the laws of nature, or the experienced

course of human conduct and affairs, and the connection usually found to exist between certain things. Where one fact is proved or ascertained, another, its uniform concomitant, is universally and safely presumed; and it is this uniformly experienced connection which leads to its recognition by law, without other proof."

In *McKendree v. Life Insurance Co.,* 112 S. C., 335, 99 S. E. ,806, 807, this Court said:

"The presumption of fact is that a man will not take his own life. Every action of a man, voluntary and involuntary, tends to preserve his life."

In 37 C. J., 618, the writer says:

"In accordance with the rule that the presumption is always against suicide or self-destruction on the part of a sane person, who came to his death under circumstances not explained, where the cause of insured's death is unexplained and the circumstances are such that it might have resulted from accident, homicide, negligence, natural causes, or suicide the presumption is in favor of death by one of such other causes and against death by suicide. Therefore the burden of proving death by suicide as a defense is on defendant, notwithstanding the verdict of the coroner's jury was suicide."

See, also, *Sanders v. Insurance Co.,* 134 S. C., 435, 132 S. E., 828; *Dill v. W. O. W.,* 126 S. C., 303, 120 S. E., 61, 37 A. L. R., 167.

In this case, the insured and his wife were found dead in their home at Columbia on the morning of July 5, 1928. Mrs. Swofford was on the bed, apparently having been killed by a blow on the head with some blunt instrument. Swofford himself was lying on the floor, near the fireplace, with his throat cut on both sides and incisions on both wrists and ankles. Lying near him was a large knife, and on the mantlepiece were a small knife and a razor blade, on all of which, as well as on an electric bulb suspended from a cord, there was blood. There were also some prints on the floor, appar-

ently made by tracks of some one who had stepped in blood, and there was blood on the dining room floor.

Mrs. Jackson, a near neighbor, who was first to go to the home of the insured on that morning testified that she entered the room in which Swofford and his wife lay dead from the back porch through a door that was shut but unlatched; that she immediately gave the alarm, and a number of other persons soon came, among them being her husband and the sheriff. There was other testimony to the effect that the front door was also unlatched, and that it was the custom of the deceased to leave the doors unlocked, thus enabling any one to enter the house without difficulty. Jackson testified that the last time he saw the insured alive was the morning of July 4, at which time he told the witness that he was going to take his wife to the sawmill with him that day, and asked the witness to take care of his milk for him. Several neighbors testified that no disturbance or commotion in the house of the deceased had been heard by them, nor was the furniture in the room where he was found dead overturned or disarranged in any way. The evidence showed that the deceased ran a sawmill, where he employed and worked a number of hands, and that a few days before his death he was paid in a lumber transaction $400.00 and that this money could not be found or accounted for. The sheriff testified that from what he saw in the room when he arrived there, it was perfectly possible for some one to have murdered the two old people.

Dr. Foster, a witness for the defense, gave it as his opinion that the wife predeceased the husband perhaps several hours. He also testified that Swofford had been suffering from pellagra for a number of years; that this is a disease from which, if properly treated, the patient may readily recover, and that usually one afflicted with it is not mentally affected by it, if at all, until he has had it for several years; that he had treated the insured for this disease for several months, during which time he had observed him

closely, looking for signs of mental derangement, and thought at one time that "he was possibly a little off," but that perhaps he would have overlooked it if he had not been hunting for it; that the insured had gained about thirty pounds; and that he thought he was better. There were others, neighbors and associates of the insured, who testified that they had never noticed anything wrong with him at any time with respect to his mentality, that he appeared at all times to be normal, that he and his wife lived happily together, and that he was an honest, hard-working man, with no apparent reason for committing suicide.

Under the testimony, it could not be said, as a matter of law, that the presumption against self-destruction had been overcome and that the fact of suicide had been established. As more than one inference could be drawn from the evidence as to how the insured came to his death, the trial Judge properly submitted the question to the jury.

The defendant offered in evidence, as a part of the proofs of death required by the company, the verdict of the coroner's jury, which the Court at first excluded, but later admitted under the authority of *Hartin v. W. O. W.*, 124 S. C., 397, 117 S. E., 409, when that case was called to its attention by defendant's counsel. In his first ruling that it was not admissible, the trial Judge made the following remarks:

"I will tell you what can come in and what not. Whatever is signed by these men can come in, what is not, or what is signed by a householder or some coroner cannot come in. What a coroner's jury found cannot come in. A hearing of that kind is not taken according to proper rules of evidence, it is an informal proceeding, anybody is allowed to come in and tell what they know or believe. That can't come in."

The appellant contends that this language was prejudicial to its case—that the Judge treated the inquisition as a casual and formal proceeding, which led the jury to conclude that

no weight should be given to the coroner's verdict in reaching their conclusion.

We find no error as complained of. The coroner's verdict, if admissible at all, was admissible only as a part of the proofs of death, and for the purpose only of showing why the company refused to pay the claim, and not to establish or to support in any way the defense that the insured, as a matter of fact, committed suicide.

The defendant requested the Court to charge the jury as follows, which was refused:

"I charge you further that the presumption of natural or accidental death is sufficiently overcome by the defendant where there are no facts or circumstances shown indicating natural death or accident, and facts and circumstances are shown which establish that the cause of the death was suicide."

The appellant urges that this refusal was error, as it left the jury without instructions as to the quantity and kind of evidence necessary to overcome the presumption.

We do not agree with this contention. The request took away from the jury the issue as to whether the deceased had not met his death from homicide. Furthermore, the law as to the matters contained in it was fully and correctly covered by the general charge.

What we have already said disposes of appellant's exception to the refusal of the trial Judge to grant a new trial.

The judgment of the Richland County Court is affirmed.

MR. CHIEF JUSTICE BLEASE, MR. JUSTICE CARTER, and MR. ACTING ASSOCIATE JUSTICE JOHN I. COSGROVE concur.

MR. JUSTICE COTHRAN (dissenting) : I do not think that the facts of this case are susceptible of but one reasonable inference; that is, that the insured in a spirit of despondency induced by the disease (pellagra), with which he was suffering, crushed the skull of his wife, who was asleep in bed, and then committed suicide in a most determined manner, as

evidenced by the facts related in the opinion of Mr. Justice Stabler.

The man and wife lived alone in a small bungalow, in a comparatively thickly settled suburb of Columbia; there were houses on both sides of their bungalow, fronting the same street and not more than a few yards from it; they were planning to spend the holiday, July 4th, on a fishing excursion at a stream some miles away; in the evening of July 3rd the wife went to a next door neighbor's and asked the lady of the house, in view of their expected early departure on the next morning, to place a bottle of milk, which customarily was placed on the back piazza, in her ice box, awaiting their return in the evening of the 4th; the lady found the bottle after the man and his wife had departed and did as requested; on the morning of the 5th, the lady becoming uneasy on account of the bottle not having been called for, crossed her back yard, to the back piazza of the Swofford home, and knocked at the door; receiving no response, she tried the door and found that although closed it was not locked; she went inside and to the bedroom, where the ghastly sight of the wife in bed in her nightdress, her head crushed and blood over the bedclothes, the husband lying on the floor, gashed as described, was presented. In a corner of the room was a small rifle, the butt of which was smeared with blood, evidently the weapon with which the wife's head had been crushed. On the floor by the dead body of the man were a cleaver, and a pocket knife, both bloody, and on the mantel a razor blade also bloody. Bloody tracks led to the kitchen where an uneaten part of a sandwich was found on the table. There was not the slightest evidence of a struggle in the bedroom; the funiture was undisturbed; not a sound had been heard by the neighbors on either side during the evening of the 4th or morning of the 5th; there was no evidence of the opening of trunks, chests, bureau drawers, or other receptacle as would have appeared in a search for money. It appeared that the wife had been dead at least eight

hours before the death of the man; decomposition to an offensive degree had set in, though not in his body. Evidently the man had wandered around in the house for several hours before completing his ghastly work.

There was not the slightest evidence that both homicides had been committed by a murderer entering the home. It is inconceivable that he should have murdered the woman in her bed and waited eight hours to kill the man. The only evidence (and that was only the expression of an opinion), tending to show that such homicides had been committed, was the statement of the sheriff, which any one could have made and which was not evidence, that the circumstances indicated that it was possible that an outside murderer had committed the crime, together with the statement that the insured had recently been paid $400 in cash which had not been found. There is no explanation of what he did with this money, whether he deposited it in the bank, paid it out to creditors, or kept it either about his person or concealed somewhere in his house.