14139

MANDIS v. NEW YORK LIFE INS. CO.

(181 S. E., 472)

*Messrs. Thomas, Lumpkin & Cain* and *Haynsworth & Haynsworth,* for appellant,

*Mr. C. Granville Wyche,* for respondent,

September 16, 1935.

The opinion of the Court was delivered by Mr. Justice Carter.

This suit, by George Mandis, as plaintiff, against the defendant, New York Life Insurance Company, was commenced in the Court of Common Pleas for Greenville County, August 17, 1933, for recovery of judgment against the defendant in the sum of $2,000.00, alleged to be owing the plaintiff by the defendant under a certain insurance policy issued by the defendant upon the life of Charley Luntos July 27, 1931, in which policy the plaintiff was made beneficiary. The face amount of the policy is $1,000.00, but the policy contains a double indemnity clause to the effect that, should the death of the insured result from accidental means, as defined in said provision of the policy, the defendant would pay the sum of $2,000.00. According to the allegations contained in the complaint, the said Charley Luntos died on or about the 1st day of June, 1933, and his death resulted from accidental means.

By its answer filed in the cause, the defendant admitted the execution and delivery of the policy in question in the face amount of $1,000.00 on the life of the said Charley Luntos, and further admitted that the beneficiary had been changed so as to make the plaintiff herein, George Mandis, the beneficiary under the policy. The defendant further admitted that the policy contained a provision for the payment of double indemnity in the event the death of the insured resulted from accidental means, as defined under said clause of the policy, and the defendant further admitted that the insured's death occurred about the time alleged by the plaintiff, but the defendant denied all liability under said policy, except for the amount of the premiums paid to the defendant on said policy. The defendant also made the following statement in its answer:

"6. In further answer to said complaint this defendant alleges that the said policy of insurance contained as an integral and inseparable part thereof the following clause and condition:

" 'Self-Destruction.—In event of self-destruction during the first two insurance years, whether the insured be sane or insane, the insurance under this policy shall be a sum equal to the premiums thereon which have been paid to and received by the company and no more.'

"7. This defendant further alleges that the provisions of said policy with respect to the payment of double indemnity specifically stated and provided that such double indemnity shall not be payable if the insured's death resulted from self-destruction whether sane or insane.

"8. This defendant further alleges, upon information and belief, that the said insured, Charley Luntos, came to his death on or about the 1st day of June, 1933, by his own hand, within the first two insurance years of said contract of insurance, and accordingly alleges that its liability thereunder is limited to the amount of premiums which have been paid thereon and no more.

"9. This defendant, upon being furnished with proofs of the death of the said Charley Luntos and ascertaining the cause of his death, on or about the 4th day of August, 1933, tendered to the plaintiff herein, or his attorney, the sum of One Hundred Eleven and 40/100 ($111.40) Dollars, representing the full amount of premiums which were paid to and received by the company under said contract of insurance, in full and complete settlement and satisfaction of its liability thereunder and said tender was declined; that this defendant, on or about August 17, 1933, advised the plaintiff herein that its check, representing a return of such premiums, is being held subject to his order, the defendant claiming no interest thereunder, and this defendant now holds said fund for the use and benefit of the plaintiff or the person who is entitled to receive the same."

Issues being joined, the case was tried at the fall, 1934, term of said Court before his Honor, Judge W. H. Grimball, and a jury. The jury failing to agree on a verdict, the trial Judge ordered a mistrial. The case was again tried at the

second session of the fall, 1934, term of said Court, before the same Judge and a jury. According to the record before us, at the conclusion of the testimony, both parties, defendant and plaintiff, made motions for a directed verdict. The motions being refused, the issues were submitted to the jury and the jury rendered a verdict for the plaintiff in the sum of $2,000.00 and costs. Motion by the defendant for a new trial being refused, from judgment entered on the verdict the defendant appealed to this Court.

Five exceptions are presented by the appellant, imputing error to the trial Judge, but, as stated by counsel for appellant, all the exceptions may be considered under the following question:

Question involved: "Did the trial Judge err in refusing to direct a verdict in favor of the defendant company on the ground that the only reasonable inference to be drawn from the evidence is that the insured committed suicide within the first two insurance years, which risk was expressly excluded by the terms of the policy?"

It is conceded that, if the insured committed suicide within the first two insurance years, the plaintiff cannot recover. It must also be conceded that, in order to entitle the defendant to a directed verdict, it must clearly appear from the record in the case that the only reasonable inference to be drawn from the evidence is that the insured committed suicide within the first two insurance years. It is clear that the insured's death occurred within the first two insurance years, but, in our opinion, it is not the only inference to be drawn from the evidence that the insured committed suicide. Under the evidence, as we view it, the Court cannot, as a matter of law, hold that the insured took his own life. There is a presumption against self-destruction, and, as we view the case, that presumption has not been overcome. As stated, more than one inference can be drawn from the evidence as to how the insured's death occurred. The trial Judge could not, under our view of the case, grant the de-

fendant's motion for direction of a verdict, and he therefore properly refused the motion and submitted the issues to the jury. It must be kept in mind that the burden of proving death by suicide as a defense is on the defendant. In this connection we quote the following from Corpus Juris: "In accordance with the rule that the presumption is always against suicide or self-destruction on the part of a sane person, who came to his death under circumstances not explained, where the cause of insured's death is unexplained, and the circumstances are such that it might have resulted from accident, homicide, negligence, natural causes, or suicide the presumption is in favor of death by one of such other causes and against death by suicide. Therefore the burden of proving death by suicide as a defense is on defendant, notwithstanding the verdict of the coroner's jury was suicide." 37 C. J., 618.

In this connection we also call attention to the following cases: *Marsh v. Pioneer-Pyramid Life Insurance Co.*, 174 S. C., 59, 176 S. E., 878; *McKendree v. Southern States Life Insurance Co. of Alabama,* 112 S. C., 335, 99 S. E., 806; and *Dill v. Sovereign Camp, W. O. W.,* 126 S. C., 303, 120 S. E., 61, 37 A. L. R., 167.

Appellant calls attention to the circumstances surrounding the death of the insured, and contends that such circumstances point to the conclusion that the insured committed suicide. It is true that the jury might have drawn that inference, but that is not the only inference to be drawn from the evidence in the case, and therefore the trial Judge could not direct a verdict for the defendant, but properly left it to the jury to say whether or not the insured killed himself or whether he died from other causes. As stated above, the trial Judge refused to grant a motion for the plaintiff because his Honor thought that more than one reasonable inference could be drawn from the testimony on the issues under consideration. Appellant calls attention to several authorities, including the following South Carolina

cases, as supporting appellant's position that the trial Judge should have directed a verdict: *Poyner v. South Carolina Railway Co.*, 26 S. C., 49, 1 S. E., 52; *McLeod v. Atlantic Coast Line R. Co.*, 93 S. C., 71, 76 S. E., 19, 705; *Latimer v. Sovereign Camp W. O. W.*, 62 S. C., 145, 40 S. E., 155; *Hartin v. Sovereign Camp*, 124 S. C., 397, 117 S. E., 409; *Bignon v. Reliance Life Insurance Co.*, 123 S. C., 338, 116 S. E., 427; *Sanders v. Commonwealth Life Insurance Co.*, 134 S. C., 435, 132 S. E., 828. These cases, in our opinion, are not in conflict with the views we have expressed herein.

Appellant also calls attention to authorities from other states, and quotes the following from Corpus Juris: "Where, however, the reasonable probabilities from the evidence all point to suicide as the cause of death so as to establish it in the light of reason, with such certainty as to leave no room for reasonable controversy on the subject the question should be decided by the trial Court as one of law."

Under our view of the case, the Court cannot hold, as a matter of law, that there is no room for reasonable controversy on the question as to how the insured came to his death, and therefore, it was proper to submit that issue to the jury.

The testimony adduced on the trial of the case, stated briefly, tends to show, in addition to the facts admitted in the answer, that on the day before his death the insured was carrying on his regular work in the restaurant he operated in the City of Greenville; that, so far as those who came in contact with him could observe he was in good spirits, seemed all right, and, so far as the record discloses, showed no signs of worry or anxiety about business or anything else. In this connection we may state that we fail to find anything in the evidence tending to show that his business was in bad shape. It further appears from the evidence that about 11 o'clock of the night he was killed the insured, while at his place of business, called his nephew, George Mandis, long distance

phone, and had phone conversation with him, and from what those nearby understood of the conversation it was agreed that George Mandis would come to Greenville on the following Monday or Tuesday for the purpose of going into business with the insured. There was also testimony to the effect that Jim Petropolis, who was a good friend of the insured, went to the said restaurant of the insured about 11 or 12 o'clock before the death of the insured on the same night. Clemson Riddle, according to testimony in the record, was also at the insured's place of business on the night in question, and he testified that he did not remember Jim Petropolis being there that night. This witness, Clemson Riddle, testified to the effect that on the said night, at the request of the insured, he addressed an envelope to the said Jim Petropolis, and further testified to the effect that at that time the insured was engaged in writing a letter or memorandum of some kind; but the witness did not know whether the letter referred to had been completed and placed in the envelope before he addressed it or not, but that after he had finished he gave the envelope to the insured. He further testified to the effect that he had never before addressed a letter to Jim Petropolis, but stated that he had addressed letters to other people for the insured. There was also testimony to the effect that this witness and the insured left the said café at 1 o'clock in the morning; that the insured went to the hotel where he had a room and the witness went to his residence in the opposite direction. The witness did not learn of the death of the insured until the following morning.

As contended by the respondent, the plan made by the insured to have his nephew go to Greenville the following week to go into business with him was some evidence that he was thinking of living and was not thinking of committing suicide. Of course, this was a matter for the jury's consideration along with all other testimony in the case, including testimony pointed out and discussed by the appellant as tending to show the opposite view.

On the morning of June 1, 1933, the insured was found dead in his room, lying across his bed with a bullet wound in his head. There was testimony to the effect that the insured's pockets of the trousers he wore appeared to have been interfered with, and that some one had had his hands in them, and had pulled out the pockets. The pockets in a pair of trousers of the insured, hanging in the closet in that room, also had the appearance of having been bothered; also a money bag under the insured's shirt was empty. In that connection, it may also be stated that the door to the insured's room was not locked and was not latched on the inside, so that, when the porter went to the insured's room, and, getting no response to his calls, he easily entered by simply turning the doorknob. There was also testimony tending to show that a diamond ring which the insured was accustomed to wear was not on his hand when the coroner arrived, and the said ring has not been located. The insured was found lying on his back, across his bed, with his hands at his side and a .45-caliber revolver was lying between his feet. Blood was all over his bed and had soaked through the mattress upon which he was lying. The bullet to which reference has been made had gone through the insured's head, and there was testimony to the effect that a piece of skull was found on the bed. The coroner who testified in the case stated that he could not tell whether or not there were powder burns on the head of the insured because of the fact that there was so much clotted blood on his head.

The coroner further stated in the course of his testimony that, when he went into the room where the deceased lay dead, he was handed a letter by one of the parties in the room, which letter was addressed to Jim Petropolis. According to the testimony, this letter had been found on the dresser in the room of the deceased. On opening this letter it was seen that it was written in Greek, and one George Paouris was requested to translate it, and he did so. It simply read, "Friend, I kill myself." There was testimony to the

effect that it was not in the same handwriting as that identified as the handwriting of the insured.

There is testimony in the case tending to establish suicide, but, when the testimony is considered as a whole, this is not the only inference to be drawn therefrom. Therefore the trial Judge properly submitted the issue to the jury.

The exceptions are overruled and the judgment of the Circuit Court affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.