15090

McMILLAN v. GENERAL AMERICAN LIFE INS. CO.

(9 S. E. (2d), 562)

*Messrs. Thomas, Cain & Black* and *Grier, McDonald & Todd,* for appellant,

*Messrs. W. H. Nicholson* and *W. R. Dunn,* for respondent,

May 22, 1940.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BONHAM.

This action is brought to recover on a policy of insurance issued by the appellant on the life of Thomas C. McMillan, with his wife, Mrs. Dona Mae McMillan, as beneficiary.

The complaint alleges the issuance of the policy; the death of Thomas C. McMillan; that due proof of his death was furnished the appellant and demand made for payment, which was refused.

For answer, the defendant admits its corporate capacity; the issuance of the policy; that Thomas C. McMillan died on or about October 21, 1938.

For further answer, it alleged that the policy was issued pursuant to its terms, stipulations and conditions, which is the contract between the parties; that a provision of the policy is thus stated in it: "In the event of a member's self-destruction, sane or insane, within one year from the date on which his insurance hereunder became effective, the liability of the Company shall be limited to an amount equal to the premiums paid on his insurance."

It further alleged on information and belief that the death of the said Thomas C. McMillan was brought about through self-destruction on the 21st day of October, 1938, hence, the only liability which exists against the defendant is a return of the premiums paid on the insurance, which has been tendered and refused, but defendant brings the money into Court and offers plaintiff may take judgment for that amount, to wit, seventy and 66/100 dollars, premium and interest. Defendant denies each allegation of the complaint not herein admitted.

The case came on for trial before Judge Thomas S. Sease and a jury, at the October, 1939, term of the Court of Common Pleas for Greenwood County, and resulted in a verdict for plaintiff in the sum of two thousand dollars. From the judgment entered on this verdict, the defendant appeals.

At the trial, plaintiff's attorney introduced in evidence the original certificate of insurance, issued by defendant under group policy No. IN204164, and rested his case. Defendant offered a copy (by agreement) of group policy No. IN-204164, with amendments and other papers attached, and then called Major Roy L. Cecil, who, being sworn, testified. For the present we content ourselves with saying that from the testimony of Major Cecil and Sheriff L. H. Harling it appears that: Thomas C. McMillan was engaged and employed under Major Cecil in the Internal Revenue Service of the United States, with headquarters at Greenwood, S. C. Their duties related to the investigation pertaining to the transportation and sale of non-tax paid whiskey, and to investigate the setting up and operating of fermenting machinery for the manufacture of illicit whiskey, and other investigations pertaining to taxes in the Internal Revenue Service, relative to whiskey. They carried pistols when they were at work. Mr. McMillan went to the Veterans' Hospital in Mississippi the last of September, 1938, and returned the evening of October 19, 1938, and reported to work. "The morning of October 21st we went to Edgefield, S. C., to conclude an investigation in that County and Aiken. We traveled in a government car, I drove it. It had in it a rear-view mirror, which was just above the top of the windshield. On the way to Edgefield, Mr. McMillan appeared to be very nervous. He said he was feeling fine and felt like working hard. He asked me several times where we were going and what we were going to do. On the way down we saw two cars, and a car and a truck, sitting near a saw mill stand; he said, 'Major, I think those are whiskey cars, * * *.' I replied that the car and truck belonged

to saw mill people and were used for that purpose. He wanted to relieve himself and I told him it was not necessary to go to the woods, to stop by the road; this he did, and got back in the car. He complained a number of times about my driving, why was I driving so slow. I was driving faster than my usual speed; I was driving about fifty-five to sixty miles an hour. We arrived at Edgefield about nine-twenty. He carried his pistol in his holster on his right-hand side. It was a thirty-eight Smith & Weston special, four-inch barrel. He got that pistol from an officer in Newberry County; I was present. He told the fellow that if the pistol was all right he would buy it. When we got to Edgefield I told Mr. McMillan I was going to the Court house and get Sheriff Harling. I parked the car in front of the Court house about ten or fifteen feet to the left of the entrance, facing the building. I got out of the automobile, locked the car and took the key out of the switch. I noticed that Mr. McMillan did not get out of the automobile, which was his usual custom. I remarked: 'Mack, you are not going to get out?' He replied: 'No, Roy, I will wait for you here.' He usually called me Major, he had never called me Roy before. I put the key back in the switch of the automobile and told him to lock the car if he should decide to get out. I had my rifle and field glasses in the car. I then went into Sheriff Harling's office, which is on the ground floor. We looked over a map of Edgefield County for probably ten minutes. Sheriff Harling and I then left the sheriff's office and came out of the Court house. The sheriff was to accompany us on the investigation. As we walked out of the Court house door, I heard an explosion, which I thought to be an automobile backfiring, and paid no particular attention to it. We had got out of the building onto the concrete walkway, under the staircase, when we heard the explosion; we were just coming out of the door. We continued to the car which was five to eight paces from the front of the building. I found Mr. McMillan sitting in his usual seat on the right-hand side, front, of the car with

his head thrown back in a slumped condition, with blood gushing out of both sides of his head, with his pistol lying down in his lap, gripped in his hand with his trigger finger through the trigger guard on the trigger. Sheriff Harling and I stood there for a second, Sheriff Harling holding his head. I then called the coroner and Dr. Dunovant. He was then in a dying condition. It couldn't have been over five or eight seconds after the explosion until we got there. He had the pistol in his right hand. I don't know whether he was a right-handed man. He carried his pistol on his right side all of the time. The wound on the right side of his head was quite large, skin and flesh were blown away, and brains blown out all over the top of the car. The hole on the left side was the usual size and type hole that a bullet would come out. That was the wound of exit, and that on the right side was the wound of entrance. All the windows in the car were up except the window on my side of the car, the left window, the right-hand front window and the back windows were raised; they were closed. The only window that was down was the left-hand front window by the driver's side. None of the windows that were up were broken. They were not shattered in any way. They had no holes in them. The windshield was all right, no damage to it. The rear-view mirror, which I usually kept at all times when I am driving so that I could have a view of the road behind, was so turned that it would show a man's head, approximately so, sitting on the right-hand front seat of the car. It was not in that position when I left Greenwood and drove to Edgefield, nor when I left the car to go to Sheriff Harling's office. The skin on the outer part of the wound looked a little dark; there were no powder burns on the skin that I could tell. I am not a physician. The bullet went practically straight through his head, may have ranged downward slightly. After going through Mr. McMillan's head, the bullet struck about four inches to the right of the door handle on the car which was parked opposite my car. Did not find the

bullet; made search for it. When Sheriff Harling and I left the Court house we went straight to our parked car. We heard the explosion and walked to the car and saw Mr. McMillan; we walked about five to eight paces, about fifteen or twenty-five feet. We walked in our usual way. It took us five or eight seconds to get there, not over that. I saw no one in the vicinity of the car occupied by Mr. McMillan. The car which Mr. McMillan was in, was in our view when we emerged from the building; we were not looking at the car particularly. I was not looking at the car, just in the general direction, speaking to the people as we passed. Saw no one approach the car at that time; saw no one walk or run away from the car at that time. If there had been any one about the car as we emerged from the building, I could have seen them; I saw no one. I examined the gun in Mr. McMillan's hand; it was the one he was using, the one he got from the officer in Newberry. There was just one exploded cartridge in the gun. I heard but one explosion. I returned the gun to the officer at Newberry. I called the coroner; he came in a few minutes. I also called Dr. Dunovant. Mr. McMillan's body was taken to the undertaker's in an ambulance. There were cars parked on both sides of my car in front of the Court house. My car was headed straight to the sidewalk. I would say that Mr. McMillan was about six feet tall; weighed around two hundred pounds. If Mr. McMillan were sitting in the automobile, the top of his head from the ceiling would be approximately six or eight inches."

On cross examination by Mr. Nicholson: "I testified at the inquest. I am called Major Cecil. You can call me private, I am a private in the rear ranks. At the inquest I told all I was asked about. The only thing I stated to the coroner's jury about this man, I asked him how he was and he said he was feeling fine and expected to do a good year's work. I did not then refer to his nervous condition. I did not then refer to his wanting to go out and examine a car or truck. That had nothing to do with his death. I knew

the cause of his death. I only told what I was asked. I didn't say anything about his wanting to get out of the car to relieve himself. The only thing I told the jury was that I asked him, on the way to Edgefield, how he was feeling and he said he was feeling fine and expected to do a good year's work. I was in charge of this work. There was no need of his going into the sheriff's office. I didn't want him in the office. It was satisfactory to me for him to sit in the car. His usual custom was for him to accompany me every step I took. I asked him if he was going to get out. I did not demur to that. It was perfectly all right for him to sit in the car. I didn't get mad because he called me Roy. I rather liked it; it was the first time he ever called me Roy. He knew me longer then, a few days, than he had ever known me before. Sometimes my men get intimate with me. There was no evidence on either side of my car where that bullet went out. We never found the bullet, all we ever found was the dent in the car on the side. A bullet from a gun put that dent there. I can't swear it was a bullet from this gun. Coming down the road from Edgefield in the early morning, when you see a car or truck parked in the bushes, it depends on where it is parked whether or not it is suspicious."

"Q. * * * The only word he ever said to you, * * * 'I am feeling better than I have in a long time, I expect to do a good year's work?' A. No, sir. We talked quite a bit.

"Q. That was the thing uppermost in your mind, and that was the thing you told the coroner's jury. He was feeling fine and expected to do a good year's work? A. Yes, sir.

"Q. That was a pistol he had had for a few days? A. He had that pistol a month and a half or two months.

"Q. He borrowed it? A. He borrowed it with an agreement to buy it if it was satisfactory.

"Q. He had never reached a decision as to whether it was satisfactory? A. We had not been back to Newberry since he borrowed it.

"Q. You didn't know whether he expected to keep it? A. He remarked to me it was a good pistol and that he liked it.

"Q. He had examined it from time to time? A. Well, I don't know.

"Q. You never saw him examine it? A. I never saw him, only at the time he borrowed the pistol.    *    *    *

"The Court: Did he ever shoot the pistol to your knowledge? A. Not to my knowledge.

"Q. I understand he was to keep it and see whether it suited him? A. That was the agreement he made with the officer in Newberry.

"Q. Major Cecil, the course of a bullet depends entirely on the object that it comes in contact with. They can be deflected one way or the other? A. Yes, sir."

Re-direct examination by Mr. Cain: "Mr. McMillan had this pistol about six weeks. He did not take it out of the holster on the way from Greenwood to Edgefield. He didn't examine it then. I have had quite a little experience with gunshot wounds. I have been shot twice myself. I am sufficiently informed to determine a wound of entrance and to distinguish between a wound of entrance and one of exit. The wound of entrance was on the right-hand side of the head (indicating portion) in the temple like. Above and in front of the ear is the best of my knowledge of where it was. The wound of exit was about the same position on the other side."

Cross examination by Mr. Nicholson: "During the last six weeks' period he had been in the Veterans' Hospital part of the time. I do not remember the number of days."

Re-direct examination by Mr. Cain: "Mr. McMillan should have been familiar with firearms. He is an army man and been in the service a number of years; he had been in

the Internal Revenue Service a number of years. That required him to make arrests when he found someone manufacturing liquor."

Cross examination by Mr. Nicholson: "Mr. McMillan received a salary of twenty-six hundred dollars a year and five dollars per diem when he was away from his post of duty."

Sheriff L. H. Harling, a witness called on behalf of defendant: "I am the sheriff of Edgefield County. Held that position in October, 1938. Major Cecil came to my office the morning of October 21, 1938. He came in there and asked me if I would go off on a little investigation. I told him I would be glad to go. We looked at a map. We were in the office about five or ten minutes. We went out together. We had just stepped out of the main entrance on the cement when I heard an explosion. I gave it mighty little thought, we hear so much. We proceeded to the car —Mr. Cecil's car. It was a V-8 Ford. Before I got to the car I saw blood gushing out of Mr. McMillan's head. I was in about five steps of the car when I noticed blood gushing out of Mr. McMillan's head. There was a driveway that went to the jail yard; a car was parked pretty close to Mr. Cecil's car on the side of the Court house. I went around the car and caught hold of Mr. McMillan's head and held it. I was on the driver's side of the car. I observed the pistol, it was gripped in his right hand lying in his lap. His finger was through the trigger guard. He was not dead at that time. My attention was directed to the position of the rear-view mirror. He was looking directly through the rear-view glass. The mirror was pulled around to the right-hand side of the car. I did not examine the pistol. Mr. Cecil took it out of his hand. It was a thirty-eight Smith & Wesson. I had met Mr. McMillan one time before. I knew Mr. Cecil at that time. Had made other investigations with him. I imagine it took us about eight or ten seconds to go from the door of the Court house to Mr. Cecil's car. It was about

ten steps. I saw no one around Mr. Cecil's car that morning. I was facing toward the car when I heard the explosion. I saw no one run or walk away from that car. No one was apprehended or charged with shooting Mr. McMillan. It was my duty as sheriff to make an investigation to determine if a homicide had been committed. There were cars parked on either side of Mr. Cecil's car. There was a driveway between the car he was sitting in and the car that was hit by the bullet on the other side. We were facing both cars. The car that was hit by the bullet was down below Mr. Cecil's car. They were both parked this way (illustrating.) The car on the right of Mr. Cecil's was, I imagine, about two feet away from the car. I examined the wound in his head. It was in his right temple here (indicating), and came out on the left side here (indicating). The bullet went in on the right side and came out on the left side. The hole on the right side was the larger. I am not in position to determine the wound of entrance from the wound of exit. The top of Mr. McMillan's head would be somewhere from four to six inches from the top of the car, that includes the hat."

Cross examination by Mr. Nicholson: "I knew Mr. McMillan, had been out on a trip with him once before. His conduct on that trip was all right. I never saw anything wrong with him. These government employees should be carefully checked over. I don't remember who we were speaking to as we came out of the Court house. I don't recall anybody speaking to us before we got to Mr. McMillan. I don't recall the date of my trip with Mr. McMillan, it had been a good while."

Dr. R. B. Dunovant, a witness for defendant, was sworn. Direct examination by Mr. Cain: "Am a practicing physician at Edgefield. Have practiced nine years. In the early morning of October 21, 1938, was called to an automobile parked in front of the Court house in the City of Edgefield. I found a whole bunch of people gathered around a car there, and a man sitting up in the car. The sheriff was

holding his head on the left side, apparently to keep him from falling any further that way. The door was open as much as it could open. The cars were as far apart as that (indicating about two feet). The right-hand door was open. This man was sitting up in there with his gun in his lap, and blood blown up in the top of the car, and blood running down the side of his face, blood on his lap, the floor and scattered around generally. The principal wound in his head was on the right side, maybe an inch above the top of the ear; it began there, a big hole blown in his head, as big as a teacup. There was a hole in the left side of his head. My judgment when I saw him was that the gas from the shell had blown this big hole in the side of his head. The skin around it was broken back, jagged and irregular, the edges of the skin which was still there showed definitely black, and the brain tissue that stayed inside showed evidence of being burned. He was alive when I got there. I imagine he was breathing some five or six times a minute; very slow, long, sighing breathing. He died, I should say, approximately fifteen or twenty minutes after that. That wound caused his death. The bullet came out probably about the same line it went in; approximately the same area on the other side as it went in on the right. I knew Mr. J. R. Scurry. He was coroner at that inquest, and conducted the inquest over that body. I was present. Mr. Scurry died about four or five months ago."

At this point the witness was asked: "From your experience with firearms and pistol wounds, will you state in what position the pistol was held at the time of its discharge?" Counsel for plaintiff objected on the ground that it had not been shown that the doctor had qualified as an expert on firearms. There ensued a colloquy between the Court, the counsel and the witness, at the end of which the Court said:

"If he is an expert and has an opinion on that. Have you attended people who have been shot? A. Yes, sir; I have seen a good many.

"The Court: I am going to let him ask the question."

The following questions were then asked the witness:

"Q. In your opinion, if a pistol is held by his head, in your opinion, what would be the appearance of the wound? A. The wounds that I have seen where the gun was two or three feet away from the head, or whatever the bullet hit, if it was made two feet away there would be powder burns around the place and a small hole where the bullet went in. To make a big hole and give the appearance of an explosion that way, it would have to be that the gas from the gun would follow the bullet in, for the gas to follow it in it would have to be up against it.

"Q. What type of wound did you find on the body? How large a wound?

"The Court: He said about as big as a teacup. Is that what you said? A. Yes, sir.

"Q. What condition was the skin around the wound?

"The Court: He said it was blown out and black all around the edges. Is that what you said? A. Yes, sir."

Cross examination by Mr. Nicholson: "You have told all you know? A. I guess so. All he asked me."

Roy L. Cecil recalled and examined by Mr. Cain:

"Q. Major, what experience have you had with firearms?

"The Court: As to gunshot wounds?

"Q. I will ask first about firearms. A. I am a major, formerly captain, in the ordnance department. I have had to do with the manufacture, maintenance, and testing of firearms for a number of years, during and after the war.

"Q. Have you had any experience with wounds caused by firearms? A. Yes, I have seen several and have been wounded twice myself."

"A wound caused by a pistol held right against the head would be a blown out wound, the gas from the shell fired by the pistol would follow the bullet into whatever it penetrated, in a human being, animal, or anything of that nature, something soft, the gas would follow in and blow out

a large hole. In order to make that type of wound the firearm must be held right against the target. If it was as far away as six or eight inches, that type of wound would not be made, it wouldn't even abrase the skin. Usually a smaller hole where it goes in than where it comes out."

Cross examination by Mr. Nicholson: "I was wounded through the thigh and right through the stomach. Not anywhere around the head. I never saw a wound exactly like that. I have seen the same type wound, classed as wound of that nature."

Plaintiff's reply. Mrs. Dona Mae McMillan sworn. Direct examination by Mr. Nicholson:

"I was the wife of Mr. Thomas McMillan. Was married August 7th, ten years ago. My husband was then in the government service. He was in the government service fourteen years when he was killed. He was a war veteran; he was in the army. He had an honorable discharge from the army, coast guard and from the navy. He was making twenty-six hundred dollars a year. He had only me to support. Our married life was pleasant. He had no financial troubles; not a thing in the world: The Goverment allowed him, in addition to his salary, five dollars a day when he was travelling. He went to the hospital September 27th; I went a few days ahead of him, I was in the City when he was in the hospital. When he was discharged from the hospital I came back to Greenwood with him; we got to Greenwood October 19th. We rented two rooms on Montague Avenue, on the Greenville Highway. That was some distance from where Mr. Cecil was staying. He worked on the 20th somewhere around town, making some investigation with local officers. I last saw him October 21st about eight o'clock. When I last saw him he was in perfectly good health, we talked all the way down to where we went. He didn't have anything to worry him, he was not worried about anything."

"Q. Mr. Cecil said on the stand that Mr. McMillan told him on the way to Edgefield that he was feeling better than

he had in some time and expected to make this his best year's work. Was that the way he impressed you? A. Yes, sir." "Mr. McMillan kept a diary of his work; he had to make reports. I have that diary. I am familiar with his handwriting; that is his handwriting. He left here the 27th to go to the hospital—September. His report says on September 26th, 'By Government car—' "

"Mr. Cain: We don't know the relevancy of that. We don't deny that Mr. McMillan worked on the 26th.

"The Court: In a general way, a diary is competent to show the state of mind. I think it is competent."

Witness continues to read: "A. On September 26th, 'By Government car No. 3260, with R. L. Cecil, to Aiken attending United States Court.' That was the last time he worked prior to the time he went to the hospital."

Witness continues to read from diary: " 'Greenwood, S. C., October 20th, 1938. Nine a. m. to 10, writing reports. Local investigations 10 to 4 p. m., in Greenwood, S. C.' The undertaker gave this to me after his death; it was in his car. (The entire record is put in evidence.) I went to Edgefield as soon as I received the news of his death, as soon as I could get myself together. When I got there I viewed the body of Mr. McMillan. I do not agree with the statement that the right side of his face was torn very much. It looked like a scar on the right side of his head, high up on the right side. I didn't see any scar on the left. I saw Mr. McMillan at the undertaker's before anything was done."

"Mr. Cain: We prefer for counsel to let the witness testify.

"The Court: * * * That is a leading question. Strike it out." "I saw him at the undertaker's; the wound had been cleaned off, you could tell it was on the right side, high up. I saw no sign of a wound on the left side, not even a scar.' "

"Q. Mrs. McMillan, from what you saw of that wound, how did you think it occurred?

"Mr. Cain: We object. We move to strike that question out.

"The Court: It was not answered therefore nobody was damaged. I sustain the objection.

"Q. Where did the wound on the left side start? A. On the right side. A little above the temple.

"Q. And went clear up to the top of the head, you testified? A. Yes, sir.

"Mr. Cain: We object to the question as leading.

"The Court: As to the last question, I can't say where she put her hand, that is for the jury to say. Let the witness testify. She used her hand, that is the reason he suggested it. Let her answer herself."

"Mr. McMillan had been in the government service. At the time I married him I was postmistress in my home town in Alabama. I lived there three years; continued to work for three years because he was traveling around; in his work he was not stationed in one place long; he was with the old prohibition department; when he got located I quit work; we were transferred to different places afterwards. I went with him and lived with him continuously until his death."

Cross examination by Mr. Cain: "Mrs. McMillan * * * Mr. McMillan went in the government. hospital the first part of October, 1938, and remained there until the 15th? A. He remained there until the 18th of October." "He went in there the 28th of September and was dismissed the 18th of October. He had not been in any government hospital before. Had not been in any private or municipal hospital as a patient. I accompanied Mr. McMillan to Major Cecil's residence the night before they went to Edgefield. It seems that Mr. McMillan went by to see where they were to work the next day. We did not stay there several hours; we went by for a few minutes and Mr. McMillan found out what

time to go to work the next day. I don't know how long we stayed there; we were there a few minutes."

"Q. Is it not a fact that Mr. McMillan was in a highly nervous and upset condition and you were worried about him? A. No, sir. I was not worried about him; no, I was not worried about his condition." "I was not worried about his attitude toward life on the night of October 20th. It is not a fact that I had been worried about him for several months. It is not a fact that one time Mr. McMillan wanted to take a bus from Abbeville and I would not let him go. I was with him practically all of the time."

"Q. You were with him for a purpose were you not? A. I am supposed to be with him except while he was out, I was up here with him, he was working—.

"Q. You went from place to place with him, you went down to Mr. Cecil's apartment with him? A. I had been there a lot of times with him." "I recall going there that night for a few minutes; I am sure it was not longer than for a few minutes."

"Q. You knew and Mr. McMillan knew that Mr. Cecil wouldn't be ready to go to Edgefield until eight or eight-thirty the next morning, and Mr. McMillan got there shortly after seven o'clock? A. It was about eight o'clock, I drove him down myself." "I stayed at Mrs. Davis' and sat in the car and talked with him. I have no recollection of being concerned about Mr. McMillan the last two days of his life. I didn't have any reason to be. I had made no statement to Mr. Cecil in regard to Mr. McMillan. We went down to inquire when he was going to work, Mr. Cecil was in charge of the car."

"Q. After Mr. McMillan's death, did you make any statement to Mr. Cecil in regard to your apprehension that Mr. McMillan might take his life? A. No, sir, I never did.

"Q. Did you make any statement to Mr. Cecil or anyone else that he had attempted to do this once before? A. No, sir.

"Q. Not on any occasion? A. No, sir. He never had attempted to do it."

"I did not make any statement in regard to it."

"Q. I asked you with particular reference to the time at Abbeville as to whether you said on one occasion he wanted to leave there by way of bus and that you thought he might do harm to himself? A. No, sir.

"Q. You don't recall making the statement to anyone? A. No, sir." "I was not worried about him the night before he died. He was dismissed from the hospital and told me he was able to go to work. He slept well the night of October 20th. He did not walk the floor; I am positive he was not restless that night and was not in any upset and highly nervous condition. I did not see him with his pistol that night. I don't know where it was; it was in the room the next day, he left his pistol at the house the next day, I knew he had one, the only one I know he had. I can produce it. When he left he did not have a pistol. I believe he had on his holster but he didn't take his pistol with him. He was figuring on buying another gun and this gun of his was too big to carry."

"Q. Was he not going out on an investigation? A. I suppose he was. He was supposed to get a pistol—." "He usually carried his pistol when he went out on investigations, but he did not that morning, didn't leave the house with his pistol. I am willing to testify that Mr. McMillan got in the car with Major Cecil and went to Edgefield and didn't have a pistol. At the time he left me he did not have a pistol; he had his pistol holster and Mr. Cecil had the gun he was planning to buy from the deputy, I think. He had left it with Mr. Cecil when he went away. He was supposed to examine it and see if he liked it, I think Mr. Cecil had it and gave it to him after he got in the car."

"Q. You didn't see the pistol. Mr. Cecil testified he had this pistol—. A. He didn't take it home with him, the only gun he had was that big gun he owned." "That is the one

I have at home. It is an old German gun; a great long one. Mr. Cecil told me he had returned the pistol that was found in his (Mr. McMillan's) hand at Edgefield to the officer at Newberry."

L. E. Sloan, witness for plaintiff, was sworn:

Direct examination by Mr. Nicholson: "Been living at Greenwood about twenty years. Now a city fireman. Been connected with the police force about nineteen years. Don't know so 'powerful much' about pistol shooting. I have been attending all these pistol tournaments they have been having in the State. I have brought back some of the premiums at these tournaments. I know a right smart about shooting a gun. I have been practicing this business about ten or fifteen years. I got some thirty-eight bullets here. I knew Mr. McMillan: I have been out on two different calls with him. He came around the city hall nearly every day. He was down there the day before he was killed. He looked like he was perfectly all right. I saw him the morning he was killed; he came down there about 8:30 o'clock for Mr. Cecil; I reckon he stayed there some five or ten minutes and left. I didn't see him any more. He seemed like he was perfectly all right. Didn't look like any trouble."

"Q. * * * Is that the kind of bullet that is ordinarily shot in one of these thirty-eight pistols? (Exhibiting cartridge.) A. Yes, that is a thirty-eight, that is a loaded bullet. That is a steel jacket." "There is no gas in the bullet or in the shooting of them. I have gas bullets and have experimented with gas bullets. If you shoot anybody with a gas bullet it is just to run them out of a room, it wouldn't hurt you at all. Our gas bullets don't carry loads with them. A bullet is easily deflected in its course, if it hits a bone in the head that is sufficient to turn it. I have been struck by a bullet. One hit me in the arm there. It went in there (indicating) and went up this arm, came out of this arm here, right about there (indicating arm), went back in this side there (indicating arm), and they took it out of my back. It

was a thirty-eight bullet. I have been shot once in the leg. (Shows the scar to the jury.) I am a living example of how bullets are deflected. As a pistol expert, I testify that any bone in the head is sufficient to deflect or change the course of a bullet."

"Q. It was testified this morning that this man's head was shot bad on the right side, that a place as large as a tea-cup was split from the wound·up the side through the skull. and blood on the top of the car. I am going to ask you to state whether or not in your opinion, a bullet shot from a thirty-eight pistol at the side of this man's head would have made that kind of wound? A. Holding it out like that (illustrating)?

"Q. Against the head (illustrating)? A. No, sir." "If he held it up like that it would have gone straight through. If he held it straight against his head, it would have gone straight through his head."

"Q. Straight through without tearing any hole?

"Mr. Cain: I object to counsel leading the witness.

"The Court: That last one is leading. It was badly leading, strike it out, and pay no attention to it, gentlemen.

"Q. What about the strength of a bullet as it leaves a pistol as compared to its strength some distance away? A. At a certain distance farther off, if it gets out a certain distance, it has got more force. It has not got as much force right up on it as it has off at a certain distance. * * *

"Q. From the description of this wound that you have heard here, the right side being torn so bad and blood thrown up on top of the car, from where did the bullet come, in your opinion, that put that wound there? A. If it tore up his right side, it had to have been—

"Mr. Cain: There is no testimony that this man's body was struck—

"The Court: You had better put it in the form, if so and so.

"Q. If the right side of a man's head is torn up, with blood thrown up on the top of the car above where he was sitting, where would you say the bullet came from that caused such a wound as that? A. If he was shot on the right side the barrel of this pistol would have to be pointed upwards if it had blown blood on the top of the car."

"These thirty-eight pistols are easy to fire; any man in service has an easy trigger. It takes some little effort for a man sitting down to pull his pistol from its holster. It is usually on his right side; he may be sitting on it. I carry mine on my right side always."

Cross examination by Mr. Cain:

"Q. Mr. Sloan, when you talk about gas bullets, you were referring to tear gas bullets, were you not? A. Yes, sir.

"Q. That is a bullet that police use to break up riots or to get in a room? A. Yes, sir.

"Q. It shoots a little container that breaks and lets gas in a particular room? A. Yes, sir.

"Q. That is not a bullet that you use to shoot somebody with that penetrates or injures? A. They don't make them with gas in them. * * *

"Q. You are familiar with firearms. You know of course that the bullet is projected by powder? A. Yes, sir.

"Q. Is it not a fact that when this powder is exploded by the spark from the cap that a gas is released, at the explosion of the powder a gas is formed as a result of the explosion of the powder? A. That is right.

"Q. That is what tends to give powder burns, the fire and gas that comes out the minute after the explosion? A. No, sir. Sparks.

"Q. Sparks come out? A. Yes, sir."

"I didn't hear Dr. Dunovant and Mr. Cecil testify this morning."

"Q. They testified that when a pistol is held against a soft object such as a human head, that there is a gas released as a result of the explosion and that gas enters the head with

the bullet and tends to tear up everything around the area entered by the bullet. Is that correct? A. I never did hold one against anybody's head. I never saw one held against anyone's head.

"Q. You don't know what would happen if it was held against the head? A. I don't believe it would tear the head up.

"Q. You have not seen it done? A No, sir.

"Q. Wouldn't you be in a better position to determine from what angle this gun was fired, if you had the benefit of seeing the wound? If you had seen the wound you would be in a better position to judge at what angle the pistol was fired? A. Yes, sir.

"Q. Therefore Mr. Cecil and Dr. Dunovant, if they testified they saw the wound, they were in a better position to tell from what angle and distance it was fired than you would be? A. I think they would be.

"Q. Isn't the muzzle velocity the greatest velocity of a projectile or bullet? The speed of a bullet as it leaves the muzzle of the gun, isn't that the highest velocity that bullet ever attains? A. Yes, sir.

"Q. Are you positive of that? A. Yes, sir.

"Q. Don't they test guns and pistols by determining their muzzle velocity? A. Any gun when the bullet leaves it, is not as stout when it leaves it as it is off a distance.

"Q. What gives it that speed? A. The barrel. It is the rifles in the barrel.

"Q. It is the powder that gives it its speed? A. The rifling in the barrel.

"Q. That determines its course of direction? A. The rifles is what gives its speed.

"Q. If it didn't have any powder would the rifles make it go? A. It wouldn't go.

"Q. Something has to propel the bullet through the course of the rifling? A. Yes, sir.

"Q. That creates a friction? A. Yes, sir.

"Q. That friction will slow things down? A. It is the rifles that speeds the bullet. A certain distance.—* * *

"Q. You deny the fact that the pistol's or gun's greatest velocity is the muzzle velocity? A. At a certain distance a bullet has got more speed away from the barrel than right at the barrel.

"Q. How far away? A. A certain distance.

"Q. What is a certain distance? A. Some fifteen feet, maybe twenty feet, according to the kind of gun. * * *

"Q. Do you admit or deny that there is a gas released at the time of the explosion of powder? A. I don't know any thing about that gas.

"The Court: If a man shoots a pistol in a closed room, there is a certain amount of smell, what is that? A. Powder.

"Q. State whether that is called gas? A. No, sir.

"Q. Have you ever made any scientific study of the subject of ammunition? A. No, sir.

"Q. You are not in a position to say whether there is a gas formed from the explosion of powder? A. Only from experience.

"Q. You admit there is a smell, an odor? A. That is powder.

"Q. Do you know that the explosion of powder makes a gas? A. I never did have any trouble with it. * * *

"Q. Mr. Sloan, the witnesses have testified in this case that there was a wound that was just above the temple about an inch above the ear and away from the ear on the forehead side, on the right side, about the size of a teacup, and that the skin had been blown back, the bones had been crushed and part of the man's brains had been scattered, and that it came out on the left side of his head. The hole on the right side of the head was considerably larger than the one on the left side. Would you not think that a wound such as that was caused by the explosion that took place right against the side of the man's head? A. If this gun had been held there—

"Q. I am asking you if this wound was the size of a tea-cup on the right side, and the skin was blown away, the skull lifted up and partly destroyed and the contents of the head scattered; and on the left side the wound was much smaller wound. Would you not think the bullet that caused that wound was fired from a gun that was flush with the right side of his head? A. I can't say. I saw where a fellow was shot with a thirty-eight with the gun in his pocket, he had it in his coat pocket and it didn't leave any such wound as that.

"Q. If it was fired from a distance it wouldn't leave a wound such as that, the penetration would be smaller and the skin wouldn't be disturbed around the area or part that was actually penetrated by the passage of the bullet? A. If this bullet had a soft nose on it, it would have been.

"Q. If the pistol that fired the shot was held a distance from the man—A. If this bullet had a soft nose on it it would have made a soft place on his head.

"Q. It would make a larger place where it emerged on the other side. The wound of exit where it came out, under the circumstances described by you, would be larger than the wound of entrance where the penetration took place, wouldn't it? A. At a distance?

"Q. Yes, sir. You have testified to the type of wound you saw where a gun exploded in a man's pocket, it didn't make the type of wound suffered by Mr. McMillan? A. I didn't see Mr. McMillan.

"Q. You said it didn't make that type wound? A. Yes, it didn't make such a wound.

"Q. You said that Mr. McMillan came by the city hall on the morning of October 21st. A. I wouldn't say whether it was the 21st. I know he was down there the morning that Mr. Cecil came back from Edgefield.

"Q. On the morning that he died? A. Yes, sir.

"Q. He was down there? A. Yes, sir.

"Q. And called for Mr. Cecil? A. He came down there and asked had Mr. Cecil been at the city hall. I told him that I had not seen Mr. Cecil.

"Q. Where did Mr. McMillan go then? A. I don't know where he went.

"Q. It has been testified that he went to Mr. Cecil's residence. Mr. Cecil said he came there at seven or seven-thirty. Mrs. McMillan said he got there about eight o'clock. A. Mr. McMillan was at the city hall about eight-thirty.

"Q. Who was with him? A. Nobody; by himself." (The plaintiff rests.)

It will be observed that we have given a pretty full synopsis of all the testimony. This case will turn upon the nature and effect of the testimony given by both sides. It is, therefore, fair to both sides that the evidence be fully before the Court.

The plaintiff introduced in chief no testimony except the insurance policy. The answer admitted that the insured was dead. Clearly, then, plaintiff planted herself upon the legal presumption that a human being is presumed not to be guilty of intentional self destruction. Evidently the plaintiff stands upon the proposition that this legal presumption has the force and effect of evidence, and that the presumption alone casts upon defendant the burden of proving that the deceased intentionally killed himself. Is that a correct proposition of the law? Has the plaintiff introduced any evidence in support of the presumption? Has the defendant offered any evidence in support of its contention that the deceased killed himself? If so, which evidence meets the requirement of being the greater weight of the evidence? Is it sufficient to entitle defendant to a directed verdict?

We have purposely included a synopsis of all the evidence.

The trial Judge charged the jury: "The plaintiff is called upon to prove the allegations of her complaint by the preponderance of the evidence, that is the material allegations of her complaint. But, in this case the defendant admits

certain matters alleged in the complaint and if the defendant had put up no testimony, *of course the plaintiff would be entitled to recover the amount of the policy and interest."* (Italics added.)

The defendant by its answer admitted the execution and delivery of the policy; that it was issued pursuant to its terms, stipulations and conditions; it admitted its corporate capacity, and that Thomas C. McMillan died October 21, 1938, "and as to the manner in which death occurred this defendant would make further showing to the Court as hereinafter alleged." The language of the charge quoted above necessarily charged the jury that plaintiff could stand alone upon the presumption against suicide and need not produce any evidence to support the presumption. It is evident that counsel for plaintiff tried the case on the contention that the presumption has the force and effect of evidence. She cited the following cases:

*McKendree v. Southern States Life Insurance Company,* 112 S. C., 335, 99 S. E., 806, 807. In that case it is true the Court did say: " * * * The presumption of fact is that a man will not take his own life. Every action of a man, voluntary and involuntary, tends to preserve his life. The testimony in this case did not so far and so surely overcome that presumption as to have warranted the Court to take issue from the jury."

That case holds that defendant is not called upon to prove the fact of suicide beyond a reasonable doubt, but only by a preponderance of the evidence. The Court erred in saying that the presumption relied on is one of fact. It is a presumption of law. The evidence is not set out in the case and we do not know whether the plaintiff stood solely on the presumption, or also offered evidence in support. If the Court intended to say that the presumption alone could take the case to the jury, there was error.

*Dill v. Sovereign Camp, W. O. W.,* 126 S. C., 303, 120 S. E., 61, 64, 37 A. L. R., 167. In this case the plaintiff did

not rest the case on the presumption alone. There is in the record evidence offered by plaintiff which made it proper to send the case to the jury on the question of suicide. In that case, on the appeal, this Court said: "It will be observed that the testimony of the witnesses upon some of the most material circumstances was in direct conflict, and upon others that it was very meager."

Of course that case had to go to the jury. The opinion was by a divided Court. Mr. Justice Cothran said: "I do not agree to the proposition contended for by the respondents, which I do not mean to say is approved by the Chief Justice, that 'in all cases based upon a presumption of fact the jury shall be the sole judges of the effect of the testimony as rebutting the presumption.' I think that the contrary is held in the cases of *Baker v. Tel. Co.,* 87 S. C., 174, 69 S. E., 151; *Parnell v. R. Co.,* 91 S. C., 270, 74 S. E., 491; *McLeod v. R. Co.,* 93 S. C., 71, 76 S. E., 19, 705."

In the case of *Sanders v. Life Ins. Co.,* 134 S. C., 435, 132 S. E., 828, 830, Mr. Blease said: " * * * We are frank to admit that if one will read carefully all the testimony, just as it appears in plain black print in the record before us, there is some reason for the belief that the insured may have committed suicide. To some it may appear that the preponderance of the evidence was in favor of the defendant's contention. That is only a question for argument, and there are grounds for the advancement of two or more theories as to how the insured died."

There was testimony in support of plaintiff's action which made it proper to take the case to the jury. There is no authority for plaintiff's contention that she may stand on presumption alone.

In *Swofford v. Life Ins. Co.,* 159 S. C., 337, 157 S. E. 7, there was evidence for the plaintiff in support of the presumption which made it proper to send this case to the jury. The plaintiff did not stand on the presumption alone, but offered testimony upon which, the presumption might stand as a presumption of law—not of fact.

In *Gibson v. Life Ins. Co.*, 172 S. C., 94, 172 S. E., 772, there was ample testimony to warrant the Court sending the case to the jury. There was evidence sufficient to raise a strong suspicion that Gibson had been killed by a certain person.

In the case of *Marsh v. Pioneer-Pyramid Life Ins. Co.*, 174 S. C., 59, 176 S. E., 878, 879, this Court said: "* * * This presumption alone was sufficient to carry the case to the jury *under the evidence in the case.* * * * " (Italics added.)

If the Court meant to say that the presumption alone is sufficient to take the case to the jury, we do not approve it. If that were the rule, an insurer would have but slight chance in defending such a suit.

In the case of *Mandis v. New York Life Ins. Co.*, 177 S. C., 390, 181 S. E., 472, 476, this Court said: "There is testimony in the case tending to establish suicide, but, when the testimony is considered as a whole, this is not the only inference to be drawn therefrom. * * * "

Here is no support of the doctrine that the presumption alone is sufficient to take the case to the jury.

In the case of *McLane v. Reliance Ins. Co.*, 192 S. C., 245, 6 S. E. (2d), 13, there was testimony for the plaintiff as to how the deceased came to his death, and testimony in support of the allegation that he committed suicide. It was proper to submit the case to the jury. But there is no support for the proposition that the presumption alone is sufficient for that purpose.

It cannot be held that these cases cited by plaintiff are authority for the proposition that the assumption against suicide has the force and effect of evidence, and is sufficient alone to take a case to the jury. If there be such holding in any of these cases, or other decisions of this Court, they are overruled.

The appellant in this case has filed six exceptions, but it elects to consider them under two heads, viz.:

1. That His Honor erred in refusing to direct a verdict for defendant on the ground that the only reasonable inference to be drawn from the evidence is that the deceased committed suicide.

2. That the charge of his Honor in regard to the presumption against suicide was so confusing and contradictory as to leave the minds of the jury in doubt and allow them to speculate on this important phase of the case.

As we see it, the cardinal question in this appeal is this: Has the presumption that a person will not voluntarily take his life the force and effect of evidence, and is it of itself alone sufficient to take the case to the jury?

The Court gave leave to the appellant to argue against the line of decisions dealing with the presumption against suicide, which respondent quoted, and which we have reviewed.

We submit that the presumption goes out of the case when creditable evidence is offered by plaintiff, or defendant, which excludes all reasonable hypotheses of death other than that of suicide. We think it was error for the trial Judge to charge that such presumption has the weight and effect of evidence.

In the case of *Craig v. Clearwater Mfg. Co.,* 189 S. C., 176, 200 S. E., 765, 768, this Court said, quoting 10 R. C. L., 870: " * * * 'It is a well-established rule that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence, and that one presumption cannot be deduced from another. To hold that a fact inferred or presumed at once becomes an established fact, for the purpose of serving as a base for a further inference or presumption, would be to spin out the chain of presumptions into the regions of the barest conjecture. * * * ' "

The case of *New York Life Ins. Co. v. Gamer* was decided by the United States Supreme Court February 14, 1938, and is reported in 303 U. S., 161, 58 S. Ct., 500, 82 L.

Ed., 726, 114 A. L. R., 1218. The opinion was by Mr. Justice Butler. The headline of the opinion is: "Presumption against suicide—weight. The presumption that a violent death was accidental rather than suicidal is not evidence and may not be given weight as evidence."

In the annotation to the *Garner case,* found at 114 A. L. R., 1226, this is said: "The effect of the decision in *New York L. Ins. Co. v. Garner* (U. S.) (reported herewith) (303 U. S., 161, 58 S. Ct., 500, 82 L. Ed., 726, 114 A. L. R., 1218), is to place this Court in accord with what is now the conventional view, that a presumption is not evidence and may not be given weight as such, although the jury may, without giving them any artificial weight as a presumption, draw the natural and logical inferences from the facts which are the basis of the presumption. * * *."

In *Jefferson Standard Life Ins. Co. v. Clemmer,* 79 F. (2d), 724, 729, 103 A. L. R., 171, the case was brought to the Circuit Court of Appeals for the Fourth Circuit from West Virginia. Circuit Judges Parker and Soper and District Judge Glenn heard the case: Judge Soper delivered the opinion of the Court. He said: "These reflections lead us to adopt the sounder view that the presumption against suicide is not evidence at all, but is a rule of law which in a case of this kind requires the conclusion, in the event of an unexplained death by violent injury, that the death was not suicidal until credible evidence of self-destruction is offered. When such evidence is offered, whether it be in the course of the plaintiff's proof or by the defendant, the presumption as a rule of law disappears from the case and the trier of facts passes upon the issues in the usual way. * * *"

Judge Soper, in the same opinion, quotes from Professor Wigmore on Presumption: " * * * 'The important thing is that there is now no longer in force any ruling of law by the Judge requiring the jury to find according to the presumption. All is then turned into an ordinary question of evidence, and the two or three general facts presupposed in the rule of presumption take their place with the rest,

and operate, with their own natural force, as a part of the total mass of probative matter. The main point to observe is that the rule of presumption has vanished; because its function was as a legal rule, to settle the matter only provisionally, and to cast upon the opponent the duty of producing evidence, and this duty and this legal rule he has satisfied.' Wigmore on Evidence, § 2487, Vol. 5, page 445."

Judge Soper said further in the *Clemmer case, supra:*

"We are concerned in the pending case only with the presumption against suicide, and our decision is confined to that subject. * * *

"But when the Court goes further and introduces the presumption itself as evidence to be considered by the jury, or places the burden on the defendant to satisfy the jury by a preponderance of evidence, he states the principle too strongly and may cause a miscarriage of justice; * * *."

In the case of *Brunswick v. Standard Accident Ins. Co.,* decided by the Missouri Supreme Court and reported in 278 Mo., 154, 213 S. W., 45, 50, 7 A. L. R., 1213, that Court said:

"If there is evidence both for and against suicide, the presumption (unless, as some of the cases hold, and the reason of the thing makes plausible, the evidence be equally balanced) has no place in the reasoning, as its very nature indicates. If, therefore, invoked, or present, it vanishes, and the question is to be thereupon resolved upon the evidence. 9 Encyc. of Ev. 885, and cases cited. Obviously, the presumption against suicide cannot continue to exist in the face of evidence showing suicide, for such a view would be utterly subversive of the well-settled doctrine, figuratively but strikingly announced by Lamm, J., substantially, to wit, that presumptions are the bats of the law, which the light of evidence frightens and causes to fly away. *Mockowik v.* (Kansas City, St. J. & C. B.) *R. Co.,* 196 Mo. (550), *loc. cit.,* 571, 94 S. W., 256. Not only do the cases and the text-books sustain this view (citing authorities), but the very legal nature of the rule of law which we

call a presumption demonstrates it. For in the very last analysis this rule of law which we call a presumption operates when it arises in the case, as the result of evidence adduced, only in two ways: (a) It either forecloses the question unless and until further evidence is offered by the other side; or (b) it shifts the burden of the evidence to the adverse side; that is all it does in the case. * * *

"Therefore it obviously follows that such a presumption is not evidence * * *."

These views are supported by the citation of cases from the Federal, Supreme and Circuit Courts, and very many of the State Supreme Courts and from textbooks.

In the annotation to the case of *Watkins v. Prudential Ins. Co.,* 315 Pa., 497, 173 A., 644, 95 A. L. R., 877, are found many citations of cases from all over the Union in support of the Supreme Court of Pennsylvania to the effect that "presumptions are not evidence and should not be substituted for evidence."

It is patent that the great weight of authority is against the view that the presumption against suicide is a presumption of fact; but is one of law and is not evidence and may. not be treated as evidence. But, however it be construed, it is plain that when the defendant offers positive and credible evidence, which is undisputed, and plaintiff is relying upon the presumption alone, the presumption is overcome.

It was said in *Joyner v. Railway Company,* 26 S. C., 49, 1 S. E., 52, 56: "* * * When the defendant offers no evidence, it becomes conclusive. When the defendant offers evidence which not only fails to explain, but in itself shows negligence, of course the plaintiff will prevail. But if defendant's evidence overthrows the *prima facie* case, and makes out affirmatively a case of accident, the presumption is gone, and the plaintiff must fail. * * * "

The case of *McLeod v. A. C. L. R. Co.,* 93 S. C., 71, 76 S. E., 19, 705, was an action for damages for killing live stock. The plaintiff offered evidence that the cattle were killed by the railroad train. Under the rule in *Danner's case,*

*Danner v. S. C. R. Co.,* 4 Rich, 329, 330, 55 Am. Dec., 678, this was enough to allow plaintiff to await defendant's evidence and if that evidence failed to overthrow the *prima facie* case of negligence thus made, plaintiff was entitled to recover. The Court said the killing of the mule in this case was a probative fact which in the contemplation of the law tended to prove negligence. When any fact raises a presumption of negligence (we interpolate that such facts must be proved in order to raise the presumption) such facts stand as evidece of negligece until overthrown. This was properly held a case for the jury. Plaintiff offered evidence which raised the presumption of negligence. The Court said that if the presumption of negligence which arose from the killing of the live stock had been completely rebutted, plaintiff could not recover.

In the case of *Baker v. Western Union Tel. Co.,* 87 S. C., 174, 69 S. E., 151, the Court said: " * * * The general rule is not, however, always applicable; for the evidence offered by the defendant may explain so clearly the act on which the presumption of negligence rests, and show due care so plainly and indisputably, that the presumption originally created would be completely destroyed. When no reasonable man could fail to come to the conclusion that the presumption had been so destroyed, and there is no other evidence of negligence, then it would not only be within the power of the Court, but its duty, to order a nonsuit or direct a verdict for the defendant. * * * "

In 32 Corpus Juris, page 650, this is found: "Where, however, the reasonable probabilities from the evidence all point to suicide as the cause of death so as to establish it in the light of reason, with such certainty as to leave no room for reasonable controversy on the subject, the question should be decided by the trial Court as one of law."

Let us review the evidence. As stated, the plaintiff offered no testimony in chief, except the policy of insurance. The only two witnesses who may be called eye-witnesses were Major Cecil and Sheriff Harling, who when coming

out of the Court House and in eight or ten paces of where Mr. McMillan sat in the car, heard an explosion. They reached the car in eight or ten seconds, found McMillan sitting in the right front seat of the automobile with blood flowing from both sides of his head, with a wound as large as a teacup in his right temple and a wound of exit in his left temple. His pistol, a thirty-eight Smith & Wesson, was in his hand as it lay in his lap with his finger on the trigger, through the trigger guard. Blood was in the car and in the top of it. The automobile was parked in front of the Court House on the public square in the Town of Edgefield. No one was seen about the car, no one was seen to run from it or to leave it when Major Cecil and Sheriff Harling reached the car within eight or ten seconds after hearing the explosion. The character of the wound on the right side of the head, as shown by the testimony of Major Cecil and Dr. Dunovant, must have been made by a ball from a pistol held close to the head. No one has been charged by the Sheriff, or other authorities, with the shooting of Mr. McMillan. Dr. Dunovant was called and reached the scene in a few minutes; found the man sitting in the car with his gun in his hand; blood blown up in the top of the car and all around. The principal wound was on the right side of his head, maybe an inch above the top of the ear, big hole blown in his head, big as a teacup. To make a hole like that and give the appearance of an explosion that way, it would have to be that the gas followed the bullet in, for the gas to follow the bullet in, it would have to be up against the head.

In reply, the only witnesses offered for plaintiff were the plaintiff herself and Mr. Sloan. Mrs. McMillan testified that she saw nothing unusual about Mr. McMillan after he came back from the Veterans' Hospital, nor when he left to go to Edgefield; that he had no financial troubles and no worries of any sort. When she saw him last he was in a perfectly good humor. She introduced Mr. McMillan's diary of the work he did before he went to Edgefield. She saw

the body at Edgefield; the wound on the right side of his head looked like a scar. She did not see any scar on the left side. The wound on the right side started a little above the temple.

Mr. Sloan's testimony related almost wholly to the use and firing of firearms and to the fact that he had seen Mr. McMillan before he went to Edgefield and he looked "all right." This witness exhibited pistol bullets for a thirty-eight Smith & Wesson. A gas bullet is just to run anybody out of a room. He testified as an expert that any bone in the head is sufficient to deflect or change the course of a bullet. That if the wound in the head of deceased was shot from a thirty-eight pistol of the size of this, it would have gone straight through.

The whole purpose of the testimony given by these witnesses, who were ably examined by plaintiff's counsel, was to establish some ground or basis for a theory that the death of the deceased might have been caused by some other way than by his own hand. It does not show one particle of proof that it did so occur.

As was said by Mr. Justice Cothran in his dissenting opinion in the case of *Sanders v. Ins. Co., supra:* " * * * The death must of necessity have occurred in one or the other of four ways: (1) Natural causes; (2) accident; (3) assassination; (4) suicide. * * * "

There is no foundation for the suggestion that this was a death from natural causes; nor is there anything beyond a mere theory, unsupported by any evidence, that it was an accident. The clear evidence dispels any idea that it was an assassination. The positive, direct and undisputed evidence can lead to but one reasonable conclusion, that it was suicide.

This Court has repeatedly said that verdicts cannot be predicated on surmise or speculation of what might have been.

In the case of *Williamson v. Southern Railway Company,* 183 S. C., 312, 191 S. E., 79, 84, this Court said:

"In *Turner v. American Motorists Ins. Co.,* 176 S. C., 260, 180 S. E., 55, 56, in which our Court discussed the scintilla rule and the sufficiency of evidence which would warrant a case being submitted to the jury, it was said: 'The meaning of the rule is that there must be some *evidence* arising out of the testimony which elucidates the issues of fact, and which enables the jury to form an intelligent conclusion. It does not authorize the admission of speculative, theoretical, and hypothetical views. It does not set aside the rule of force in this State relating to *res ipsa loquitur,* which doctrine does not prevail in this State.'

"Verdicts cannot be allowed to rest upon mere surmise, conjecture, or caprice. The fact that an injury may have occurred in one of a dozen ways, of course, would not defeat the plaintiff's right of recovery, if the evidence tended to sustain the reasonable probability of the one relied on. In the instant case, however, the causal connection between the defendant's alleged negligence and the death of plaintiff's testator has not been shown."

The trial Judge erred in refusing to grant the motion for a directed verdict for the defendant.

The judgment is reversed and the case is remanded with instruction to enter judgment for the plaintiff for the sum of seventeen and 66/100 dollars, and judgment for defendant in all other amounts claimed under the policy sued on.

MESSRS. JUSTICES BAKER and FISHBURNE and MR. ACT-ING ASSOCIATE JUSTICE WM. H. GRIMBALL concur.

MR. JUSTICE STUKES dissents.

MR. JUSTICE STUKES (dissenting) :

Appellant states in argument that its six exceptions raise two questions. Taking the latter in reverse order, the second is: "Was the charge of his Honor, the trial Judge, in regard to the presumption against suicide, so conflicting and contradictory as to confuse the minds of the jury and leave them in doubt and allow them to speculate on this important phase of the case?"

Omitting formal parts, the Judge's charge was as follows:

"The plaintiff is called upon to prove the allegation of her complaint by the preponderance of the evidence, that is, the material allegations of her complaint. But, in this case the defendant admits certain matters alleged in the complaint and if the defendant had put up no testimony, of course the plaintiff would be entitled to recover the amount of the policy and interest.

"But, the answer of the defendant alleges by way of defense that there is a provision in the policy, which of course is binding on both parties, that provides: 'In the event of a Member's self-destruction, sane or insane, within one year from the date on which his insurance hereunder became effective, the liability of the Company shall be limited to an amount equal to the premiums paid on his insurance,' which would be, including interest, seventeen dollars and sixty-cents. In any event, if the plaintiff fails on her main contention then your verdict would be, 'We find for the plaintiff Seventeen Dollars and Sixty-six Cents.'

"Of course, the main contention confines itself around the question of the allegation of the answer that the insured committed suicide. The law is brief as to that. The law is that a person is presumed not to be guilty of intentional self-destruction, which as you and I know it, is suicide. Suicide means an intentional self-destruction, it wouldn't mean a negligent self-destruction, but it means an intentional or willful, which is the same thing, intentional or willful self-destruction.

"I instruct you gentlemen that the burden is upon the insurer to prove, not beyond a reasonable doubt, but by the greater weight of the evidence, and not necessarily by the greater number of witnesses, that the insured did intentionally kill himself, or prove that it was suicide. If that has been established by the preponderance of the evidence from any testimony that you have heard, then the plaintiff cannot recover. But that is always a question for the jury. After weighing all the circumstances, after weighing all of the

testimony, if the insurance company has satisfied you by the preponderance of the evidence that this man committed suicide, then the plaintiff is only entitled to recover seventeen dollars and sixty-six cents. If the defendant has failed to show suicide, as I have defined it, then the plaintiff would be entitled to the sum of two thousand dollars with interest from thirty days after the death of the deceased at six per cent.

"Counsel for the defendant has asked me to charge you the following propositions of law. It might be a charge on the facts, but it is a correct principle.

" 'I charge you that in establishing her case the plaintiff does not have the aid of a so-called presumption that the insured's death did not result from suicide. You may keep in mind the general probability against suicide—a probability arising from "the usual current of things," but such so-called presumption cannot, and does not have the force of evidence.'

"The Court: I charge you that, gentlemen, in connection with what I have charged you."

The exceptions relevant to this question are the last three, numbers 4, 5 and 6, as follows:

"4. Because the Court erred in refusing to charge the request submitted by the defendant without modification or restriction, the error being that such request embodied the applicable principle of law governing the issues raised by the pleadings and evidence.

"5. Because the charge of his Honor, the presiding Judge, relating to the cause of insured's death, was conflicting, contradictory and confusing by reason of the fact that the jury was first charged that the law is that a person is presumed not to be guilty of suicide, and was later charged that the plaintiff in establishing her case did not have the aid of the so-called presumption that the insured's death did not result from suicide.

"6. Because the Court erred in charging the jury in effect that the so-called presumption against suicide had the

force of evidence and may be considered as such, where the defendant had offered testimony tending to show that the insured committed suicide and testimony to exclude any other reasonable hypothesis of death."

The first of the copied exceptions, Number 4, is not substantiated by the record. Unfortunately the latter does not include a separate copy of the request but it appears from the charge in the record, *supra,* that the request was charged *verbatim* for it appears in quotation marks. It must therefore be assumed that appellant refers to the following from the Judge as modification or restriction: "I charge you that, gentlemen, in connection with what I have charged you." The exception points to no other portion of the charge which served to modify or restrict the granted request and is therefore not a complete assignment of error, required by the rules of this Court, and does not merit consideration. However, search of the short charge discloses no instruction in conflict with appellant's request. More will be later said concerning this request and the charging of it in a general discussion of these particular exceptions.

Exception Number 5 charges that conflict, contradiction and confusion in the instructions resulted from the inclusion of *appellant's own request.* This is not an unfair criticism of the exception for the only conflict with and contradiction of the requested charge which is pointed out is that the Court had earlier instructed that a person is presumed not to be guilty of suicide. Such is certainly the law as will later be elaborated. Despite counsel's designation "so-called", this presumption is very generally considered to be the strongest of all the legal presumptions save one, that of the innocence of one charged with crime. The request is a very good statement of the law in most jurisdictions (see *infra*); it might have been improved, possibly against appellant's interest, by the inclusion of the words "as evidence" after the word presumption where it first occurs, in the first line, but the next sentence clarifies the meaning admirably and makes the instruction to the effect

that while the jury may keep in mind the general probability against suicide, the "presumption cannot and does not have the force of evidence." If there is conflict, contradiction and confusion within the requested charge, which I cannot find, the appellant, the petitioner for the charge, cannot complain.

Exception Number 6 is not borne out by the record, a circumstance which counsel should successfully guard against. It charges that the Court instructed the jury "in effect that the so-called presumption against suicide had the force of evidence and may be considered as such * * *." Quite to the contrary the Court instructed, in compliance with counsel's prayer, that "such so-called presumption cannot and does not have the force of evidence." No further discussion of this exception is necessary.

The foregoing exceptions relating to the instructions to the jury should be overruled. In connection with them appellant petitioned and was granted leave to argue against certain former decisions of this Court which are said to hold that in such a case as this the presumption against suicide is evidence and may be so considered and weighed by the jury against evidence *contra*. But appellant's position in this respect is inappropriate and need not be considered. Through the agency of its able counsel it was not held in the trial of this action to the rule it would argue against here; instead it persuaded the trial Court to adopt what appears to be the majority rule that the presumption against suicide in such a case as this is not evidence but serves to cast the burden of proceeding or, as it is expressed by some writers, the burden of evidence, upon the insurer. This rule is stated in 20 A. J., 170, as follows: "The effect of a presumption is to invoke a rule of law which compels the jury to return a verdict in accordance therewith, in the absence of any evidence to the contrary from the other side. If the opponent does present such evidence, then the presumption vanishes, and the jury may consider the proof free from any such rule. Thus, the presumption that death

resulted from an accident or natural causes rather than from suicide * * * when met by rebutting proof is not evidence and is not to be treated as such by the jury in arriving at a verdict. Such a presumption merely aids in establishing a *prima facie* case and has no probative effect when countervailing proof is given."

Sections 219 and 220 on pages 215 and 216 of 20 A. J. throw further light upon the subject; they are as follows:

"In cases where death is an issue, but there is nothing to show whether death was caused by accident or by suicide, a rebuttable presumption arises that accident rather than suicide was the cause. In other words, all other things being equal, it is to be presumed when a person is found dead, that he did not die by his own hand. This rule finds frequent application in actions upon insurance policies where it is doubtful whether the death of the insured was caused by accident or by suicide. It has been applied also in cases arising under the Workmen's Compensation Acts. The presumption against suicide is based on the almost universal human characteristics of love of live and fear of death, rather than upon any difficulty of producing evidence. This presumption is said to rest upon the common knowledge that sane persons do not ordinarily kill themselves.

"The presumption against suicide is a strong presumption of fact which, it has been said, ought not to be displaced by slight contrary proof. It is a rule of law which permits, and according to some Courts requires, the conclusion, in the event of an unexplained death by violent injury, that the death was not suicidal until credible evidence of self-destruction is offered. It does not control where there is substantial proof from which rational consideration may reach the conclusion of suicide. It does not exist where it appears that the decedent was insane. In other words, proof of insanity will rebut any presumption that might otherwise arise against suicide.

"The authorities are not agreed upon the broad question whether this presumption against suicide has any proba-

tive force after the introduction of evidence bearing upon the claim of suicide. Most Courts adhere to the view that this presumption does not constitute evidence or possess probative force after the introduction of evidence tending to show how death occurred. According to this view, the legal presumption indulged that death was due to accident rather than to suicide disappears when circumstances are adduced showing how the death occurred. In other words, according to the majority view, when such evidence is offered in the course of either the plaintiff's or the defendant's proof, the presumption as a rule of law disappears from the case and the triers of the facts pass upon the issues in the usual way. But there are other courts affirming the view that the presumption against suicide is in the nature of evidence, to be submitted to, and weighed by, the jury in the light of the other facts and circumstances in determining the issue of suicide. The jury, in evaluating the issue of suicide, may consider the facts and circumstances in the light of common knowledge and experience that mankind instinctively desires life, and shuns death."

In the trial of this case it appears that both counsel for plaintiff and defendant recognized this force of the presumption, for plaintiff introduced the policy of insurance and called the attention of the Court to the fact that the death of the insured was admitted in the answer and rested, whereupon the defendant assumed the burden and without making any motion for nonsuit proceeded to offer evidence of circumstances tending to establish suicide and upon its closing, the plaintiff's testimony was offered, as was that of another, both tending to negative suicide by showing the absence of motive, tendency, etc.

Regardless of any presumption it must be held that the defense of suicide is in the nature of an affirmative defense and the jury should have been instructed, as in effect it was, that the burden of proving such by the greater weight of the evidence was upon the defendant and the issue was for the jury unless it should be decided by the Court that there

can be drawn from the testimony only one reasonable inference, in which event the verdict should be directed in accord with such single reasonable inference, whether for plaintiff or defendant. That the burden of proof, or as sometimes now expressed the burden of persuasion, so rests in such a case as this is shown by numerous authorities, this being different from a suit upon an accident policy or for double indemnity for accidental death where the burden is upon the plaintiff. See cases cited in 19 S. E. Digest, Insurance, 646 (7), and note in 103 A. L. R., 185.

The last-mentioned annotation is to the case of *Jefferson Standard Life Insurance Company v. Clemmer,* 4 Cir., 1935, 79 F. (2d), 724, 730, which is reported beginning at page 171 of 103 A. L. R. From the opinion is quoted the following, pertinent to this case: "Ordinarily, it is not necessary to refer to the presumption against suicide in the charge to the jury. If the basic fact of death by violence is admitted, or proved, the presumption arises, and in the absence of countervailing evidence, the Judge should direct a verdict for the plaintiff. If such evidence is produced, the Judge should charge the jury in the usual fashion. He may of course refer in his discretion to the improbability of suicide as an inference of fact, based on the common experience of mankind, but the jury should be permitted to give the inference such weight as it deems best, undisturbed by the thought that the inference has some sort of artificial probative force which must influence their deliberation. Likewise as to the opposing evidence, the jury should be instructed to weigh its credibility and effect in the usual way, and finally, upon the whole evidence, to determine whether death by accident has occurred, bearing in mind that if the evidence leaves their minds in such doubt that they are unable to decide the point, the verdict should be against the party upon whom the burden of persuasion rests. Such a charge can be easily understood and enables the jury to do justice to both sides."

And further: "If death from any cause except suicide is insured against, the burden is on the company to prove the exception."

The A. L. R. editor digests this decision in the following language at page 194 of his note with which no conflict can be found in the instructions to the jury in the case at bar: "It was held in the reported case (*Jefferson Standard Life Ins. Co. v. Clemmer* [4 Cir., 79 F. (2d), 724, 103 A. L. R.], 171), that while the presumption against suicide, as such, is not evidence, the jury may take into consideration the abnormality of suicide, and give such probative force as their judgment dictates to the consideration upon which the presumption is founded, in a case of death by violence, so long as the inference or probabilities are estimated for their intrinsic value, and are not given the artificial additional probative effect as a presumption. It is not ordinarily necessary, the Court stated, to refer to the presumption against suicide in the charge to the jury, but the Court may in its discretion refer to the improbability of suicide as an inference of fact based on the common experience of mankind."

In view of the evidence in this case and the impression of mystery which it makes upon the mind, the following is an interesting citation and comment from this annotation, page 186 of 103 A. L. R.: "Thus in *Brunswick v. Standard Accident Insurance Company* (1919), 278 Mo., 154, 213 S. W., 45, 7 A. L. R., 1213, involving an accident insurance policy, the Court stated: 'The presumption against suicide is a rule of law deduced from convenience and necessity; it is based on the well-nigh universal human characteristic of love of life and fear of death, and it arises in a case whenever the cause of death is in issue and the evidence discloses a state of facts consistent with either accident or suicide. While the doctrine is a veritable presumption of law, it is sometimes and in some of the cases loosely spoken of as a presumption of inference of fact, and is put in the category of evidence. While a few authorities assert

the converse, by far the better view is that it is not evidentiary in character; yet when invoked in the trial of a case, in a way as a constituent of evidence, it undoubtedly accomplishes a function of evidence *pro hac vice*. It is to be invoked, or automatically arises, to be exact, when there is no convincing evidence for or against suicide; and in such case, perforce this presumption alone, a finding in favor of accidental death will be upheld. * * * If there is evidence both for and against suicide, the presumption (unless, as some of the cases hold, and the reason of the thing makes plausible, the evidence be equally balanced) has no place in the reasoning, as its very nature indicates. If, therefore, invoked, or present, it vanishes, and the question is to be thereupon resolved upon the evidence. * * * Obviously, the presumption against suicide cannot continue to exist in the face of evidence showing suicide, for such a view would be utterly subversive of the well-settled doctrine, figuratively but strikingly announced by Lamm, J., substantially, to wit, that presumptions are the bats of the law, which the light of evidence frightens and causes to fly away. *Mockowik v. Kansas City, St. J. & C. B. R. Co.* (1906), 196 Mo., 550, *loc. cit.* 571, 94 S. W., 256.' And further: 'Therefore, it obviously follows that such a presumption is not evidence, but that it is a mere term in legal nomenclature, employed to designate the imperative duty or burden upon the side against which the presumption operates, of producing evidence to rebut the finality of the legal conclusion which arises, in the course of a trial of a case, from the proof of other facts.' However, in this case, in which it appeared that the insured was seen to fold up crystals of potassium cyanide in his handkerchief (which was found in his pocket after his death) a few minutes before he was found dead from taking this poison, and that he was aware of the deadly nature of the substance, the Court held that the facts established by the evidence were not sufficient to exclude 'every reasonable hypothesis favoring accident', and that there was left, 'on account of the

presumption against suicide, an inference of accident sufficient to take the case to the jury.' "

It would appear that the charge to the jury in this case given at the request of appellant, was taken from the case of *Watkins v. Prudential Ins. Co.,* 315 Pa., 497, 173 A., 644, 95 A. L. R., 877, digested on page 187 of this note in 103 A. L. R. There the Court held that it would have been proper to instruct the jury that in trying the issues and *in balancing the evidence for and against the conflicting theories of accidental death and suicide, the jury keep in mind the general probability against suicide, arising from the usual occurrence of things.* It is interesting to compare the emphasized words with the charge here, quoted above. This was an action for double indemnity for accidental death with resulting burden of proof upon the plaintiff, not as here with burden of proof upon the defendant. This case of Watkins is fully reported in 95 A. L. R., 869.

No reasonable inference can be drawn from the evidence in the case at bar other than that the insured shot himself; the issue, resolved by the jury in favor of the plaintiff, is whether intentionally or not, whether suicide or accident. A similar case was *Del Vecchio v. Bowers,* 296 U. S., 280, 56 S. Ct., 190, 193, 80 L. Ed., 229, also treated in this A. L. R. note 103 A. L. R., at page 187, in the opinion in which this appears: "When a trier of facts is to be persuaded of the truth of a disputed proposition, one or the other of the parties, the proponent or the opponent, has the burden of going forward with evidence. In the present instance, the fact that the wound was self-inflicted permits but one of two conclusions; either the decedent accidentally killed himself, or he committed suicide. Considerations of fairness and experience in human affairs induced fact-finding bodies, where there is a balance of probability, to adopt a working assumption as the basis of a conclusion, unless and until the facts are developed by evidence. The natural love of life, the comparative infrequency of suicide as contrasted with accident, and the likelihood that testimony as to the

cause of death would be more readily available to the employer than to the claimant justify a presumption, which the law indulges in such a case, that the death was accidental."

A later case from the United States Supreme Court is that of *New York Life Insurance Company v. Gamer,* 1938, reported in 303 U. S., 161, 58 S. Ct., 500, 503, 82 L. Ed., 726, 114 A. L. R., 1218. It was an action for double indemnity where the burden of proof, as we have seen, is upon the plaintiff and the case was remanded for a new trial by jury for erroneous instructions relating to burden of proof and error in instructing to the effect that the presumption against suicide should be weighed by the jury against evidence *contra.* The rule announced is in striking agreement with the instruction in the case at bar; summed up in the words of that high Court, speaking through Mr. Justice Butler, it is: "In determining whether by the greater weight of evidence it has been established that the death of the insured was accidental (I interpolate: because in that case the burden was on plaintiff to so show; to make completely applicable to this case substitute 'suicide' for 'accidental' because here the burden was upon defendant to establish its affirmative defense of suicide), the jury is required to consider all admitted and proved facts and circumstances upon which the determination of that issue depends and, in reaching its decision, *should take into account the probabilities* found from the evidence to attend the claims of the respective parties."

Emphasis has been added to bring out the marked similarity of this recent statement of the highest Court of the land to the charge to the jury in the case at bar. Immediately before the foregoing quotation this occurs in the opinion: "Upon the fact of violent death without more, the presumption, *i. e.,* the applicable rule of law, required the inference of death by accident rather than by suicide. As the case stood on the pleadings, the law required judgment for plaintiff." And this was a case where, as pointed out

above, the plaintiff bore the burden of proof of accident. The Court went on to rule and hold that after contrary evidence (to wit, evidence tending to show suicide) was introduced the presumption was not evidence and could not be given weight as evidence, precisely as charged in the instant case.

It is clear that should this Court discard the presumption entirely, we would be in disagreement with all of the foregoing authorities; in fact no authority therefor has come to my attention. The presumption of law against suicide arises from the fact of death when the latter is proven or, as here, admitted; and when the death is a violent one, as here, the presumption is, in effect, that death came from accident and the better and majority rule clearly seems to be that such may be considered by the jury for what it is worth to them along with the evidence in the case.

In keeping is the following opinion of the commentator on the Gamer decision in 114 A. L. R., at page 1226: "The effect of the decision in *New York Life Insurance Company v. Gamer* (U. S.) (reported here with [303 U. S., 161, 58 S. Ct., 500, 82 L. Ed., 726, 114 A. L. R.], 1218), is to place this Court in accord with what is now the conventional view, that a presumption is not evidence and may not be given weight as such, although the jury may, without giving them any artificial weight as a presumption, draw the natural and logical inferences from the facts which are the basis of the presumption." (Emphasis mine.)

The latest reference to the subject found in A. L. R., appears in Vol. 115, page 404, and is as follows: "The great weight of authority at the present day supports the view that a presumption is not evidence and has no probative force, and that where the opponent offers some substantial evidence to the contrary, the presumption disappears and should not be weighed by the jury, although they may still draw reasonable inferences from the facts which gave rise to the presumption." (Emphasis added.)

Analysis of the foregoing authorities, illustrative of the rule contended for by appellant, and the charge of the trial Judge, demonstrates, I think, that they are not in conflict; appellant prevailed in its contention in the lower Court and has nothing to found its appeal upon. The Exceptions 4, 5 and 6 and the argument thereon create a "straw man" whose shadow even is not found in the record; and review of former decisions of this Court on the subject is not required or appropriate in the consideration of this appeal on the record before us.

In this view the question is not made as to whether the presumption against suicide is evidence or should be weighed by the jury as such, for appellant's able counsel procured the Court to instruct in this case to the contrary. The existence of the policy and the fact of the death of the insured (established by the pleadings, whereby the presumption against suicide was immediately raised) required submission to the jury for trial the issue of suicide raised by the defendant, unless the evidence offered by the latter, considered with the evidence thereabout offered by the plaintiff, is such that it will justify only one reasonable inference— that of suicide, intentional self-destruction—in which event the direction of a verdict for the defendant would be proper. This, in my opinion after careful consideration of all of the evidence in the record, is not such a case as would warrant such direction in view of the rule, for which no citation of authority is necessary, that upon motion thereof the evidence must be considered in the light most favorable to the party against whom the motion is made.

The latter anticipates appellant's first question which is: "Did his Honor, the trial Judge, err in refusing to direct a verdict in favor of the defendant company, on the ground that the only reasonable inference to be drawn from the evidence is that the insured committed suicide within the first insurance year, a risk expressively excluded in the coverage of the policy?"

The question is properly made by Exceptions 1, 2 and 3, which impute error to the lower Court for failure to grant appellant's motion for a directed verdict in its favor upon the ground that the evidence was reasonably susceptible of only one inference—suicide.

Under all of the evidence in the record I am unable to bring myself to the conclusion that the only reasonable inference to be drawn is that the insured did in fact intentionally shoot himself, this largely because of the failure to show any suicidal tendency, motive or inducing circumstances, together with the fact that he had a new pistol, was sitting alone and "killing time" under circumstances favorable for his "pranking" therewith. In this connection I think that I can do no better than to quote from the record the words of the able and long-experienced trial Judge in his refusal of defendant's motion for the direction of verdict made at the close of the testimony: "The Court: I am going to overrule the motion for a nonsuit or directed verdict, either one or both. Not only must it be proven that it was self-destruction, but that it was intentional self-destruction. You know of people that project with a pistol, may stick it against his head, projecting around, and not intend to kill himself. A man has got to intentionally kill himself. He may have pulled the trigger, I don't know, that is for the jury, may have pulled the trigger not intending to pull the trigger, that is not suicide."

I reach this conclusion of agreement with the Court below without conscious influence of the inference against suicide; but under the rule of the majority of the decisions, above adverted to at length, that the jury may in reaching a verdict consider the general probability against suicide, as they were instructed in this case at the instance of appellant, I know of no valid reason why the Court should not similarly consider it on motions for nonsuit and directed verdict. Indeed, it logically must where such consideration is necessary to a decision.

This disposes of the exceptions, all of which I think should be overruled, and the judgment below affirmed.

ON PETITION FOR REHEARING

June 29, 1940.

*Per curiam.*

The petition for rehearing filed by respondent, as well as that filed by Mr. Jimmie F. Rast, as *amicus curiæ* (with the consent of the Court), have both of them, as they deserved, received the earnest consideration of the Court. They were presented with commendable zeal and proper regard for the rules of Court. After careful consideration of the petitions and the record in the case, we do not find that any matters are presented in behalf of the petitioners which were not considered and determined in the preparation of the Court's opinion.

It seems to us that there is no basis for alarm over the opinion in this case. The Court did not intend to hold, and the opinion does not hold, that on a policy of insurance containing a "suicide clause," and where such clause is pleaded by the insurer, that the beneficiary of the policy of insurance must prove more than the insurance contract, and the death of the insured in order to establish a *prima facie* case. In other words, up to this point, the beneficiary named in the policy of insurance can rely on the presumption against suicide, and if no testimony is offered by the insurer, then the beneficiary of the contract of insurance would be entitled to a directed verdict.

The opinion does hold that the presumption against suicide is one of law and not of fact; and the opinion further holds that the only reasonable inference to be drawn from all of the testimony is that in fact the insured intentionally took his own life, and therefore the trial Judge should have granted the motion for a directed verdict in favor of defendant-appellant.

The petition is refused, and it is directed that the order hereon be published with the opinion.

Mr. Chief Justice Bonham, Messrs. Justices Baker and Fishburne and Mr. Acting Associate Justice Wm. H. Grimball concur.

Mr. Justice Stukes:

I understand the effect of the foregoing order on the petitions for rehearing is to confine the decision of the majority of the Court to a reversal of the judgment of the Circuit Court upon the single ground that verdict should have been directed for the defendant on the facts. For the reasons stated in the latter portion of my dissenting opinion I think that the evidence is susceptible of more than one reasonable inference, on which account I am in favor of granting a rehearing.